Ricardo ORTIZ, Petitioner,

v.

Brad LIVINGSTON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. EP–03–CA–026–DB.

United States District Court, W.D. Texas, El Paso Division.

March 15, 2006.

Ellen Stewart-Klein, Office of Attorney General, John Andrew Hutton, Tex. Atty. Gen., Austin, TX, for Respondent.

## MEMORANDUM OPINION & ORDER

BRIONES, District Judge.

Before the Court is Petitioner Ricardo Ortiz's ("Ortiz") federal petition for habeas corpus relief, filed through counsel on February 9, 2004. Therein, Ortiz attacks his state conviction and death sentence for the capital murder of Gerardo Garcia ("Garcia"), pursuant to Texas Penal Code § 19.03(a)(2).[1] After carefully considering the record below and the Parties' pleadings, the Court finds that Ground One of Ortiz's Petition is partially barred from a federal merits review. As to the portion of Ground One and Ortiz's six remaining grounds of error that are properly before the Court, the Court concludes that Ortiz has not established that he is entitled to relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Although the Court will grant Ortiz a Certificate of Appealability regarding Ground Five of his federal petition (i.e., the trial court's alleged violation of the *Ex Post Facto* Clause), it will decline to certify his remaining issues for appeal.

### I. FACTS & PROCEDURAL HISTORY

Garcia was found dead in the El Paso County Jail on August 19, 1997.[2] A sheriff's detective found a syringe in the section of the jail where Garcia had been

Robin R. Norris, Jr., El Paso, TX, Matthew DeKoatz, El Paso, TX, for Petitioner.

---

1. Texas Penal Code § 19.03(a)(2) provides, in pertinent part, that a person commits a capital offense if he commits murder, as defined by Texas Penal Code § 19.02(b)(1), and "intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6)." TEX PENAL CODE ANN. (Vernon 2005). Here, the State alleged that

Ortiz murdered Garcia in "retaliation," as that offense is defined under Texas Penal Code § 36.06. The Court discusses the provisions of § 36.06 in Part VIII.A, *ante*, of this Opinion.

2. *State v. Ortiz*, Trial Ct. No. 980D08993, Rep. R., Vol. 31 of 37, at 105 & 107 (test. of Juan Contin, M.D.).

confined.[3] On September 17, 1998, the state Grand Jury sitting in El Paso County, Texas, returned a one-count Indictment against Ortiz, charging him with Garcia's murder. Trial on the merits began on June 14, 1999.

### A. Guilt–Innocence Phase—the State's Case-in Chief

The State presented the following evidence in support of its case.

#### 1. Testimony of Juan Contin, M.D.

Juan Contin, M.D. ("Contin"), Chief Medical Examiner for El Paso County, autopsied Garcia's body on August 20, 1997. Contin later testified at trial regarding his findings.[4]

Contin explained to the jury that, when heroin is injected into or otherwise enters the bloodstream, the body quickly metabolizes it into various other substances, primarily morphine.[5] Contin further related that, in his professional experience, morphine in its pure state was not available on the streets of El Paso, whereas heroin was readily obtainable.[6] Given the high levels of morphine he found in Garcia's blood and the street-level unavailability of pure morphine, Contin concluded that Garcia died of acute narcotism, specifically, a heroin overdose.[7]

Contin recounted that the morphine levels in Garcia's body were unusually elevated, even for an overdose case.[8] Contin told the jury that his office had investigated seventy-six deaths from acute narcotism from January 1995 to September 1997.[9] At a concentration of 523 nanograms per milliliter (ngs/ml), Contin explained, the amount of morphine in Garcia's blood was three times greater than that encountered in the average overdose victim (i.e., 170 ng/ml).[10]

Contin stated that, upon examining Garcia's body, he found a single fresh needle mark on Garcia's left arm, in the fold between the upper arm and forearm.[11] Contin, however, did not observe any needle track marks.[12] Contin informed the jury that he worked part-time in a methadone center and thereby had encountered hundreds of individuals addicted to heroin.[13] In Contin's opinion, the absence of needle track marks on Garcia's body suggested that Garcia was not a heroin addict.[14]

#### 2. Testimony of Mario Hernandez

Mario Hernandez ("Hernandez") was housed in the same section of the El Paso County Jail as Garcia when Garcia died.[15]

3. *Id.*, Rep. R., Vol. 33 of 37, at 31–33 (test. of Det. Onessimo Esparza).

4. *Id.*, Rep. R., Vol. 31 of 37, at 89 (test. of Juan Contin, M.D.).

5. *Id.*, Rep. R., Vol. 31 of 37, at 91–92.

6. *Id.*, Rep. R., Vol. 31 of 37, at 92.

7. *Id.*, Rep. R., Vol. 31 of 37, at 91–92.

8. *Id.*, Rep. R., Vol. 31 of 37, at 98–99.

9. *Id.,* Rep. R., Vol. 31 of 37, at 98.

10. *Id.*, Rep. R., Vol. 31 of 37, at 98–99.

11. *Id.*, Rep. R., Vol. 31 of 37, at 95. On cross-examination, Contin acknowledged that he observed no evidence suggesting that Garcia engaged in a physical struggle immediately before his death. *Id.*, Rep. R., Vol. 31 of 37, at 105.

12. *Id.*, Rep. R., Vol. 31 of 37, at 95.

13. *Id.*, Rep. R., Vol., 31 of 37, at 94.

14. *Id.*, Rep. R., Vol. 31 of 37, at 95–96.

15. *State v. Ortiz*, Trial Ct. No. 980D08993, Rep. R., Vol. 31 of 37, at 120–21 (test. of Mario Hernandez). A second witness in this case bears the surname Hernandez. To avoid

Hernandez testified that this particular section of the jail was known as the "Texas Syndicate Tank" because individuals confined there were associated with the Texas Syndicate gang.[16] Hernandez explained that he did not belong to the gang, but was placed in the tank because of his cousin's affiliation with the organization.[17] Hernandez stated that he knew neither Ortiz nor Garcia before encountering them at the jail.[18]

Upon arrival, Ortiz took control of the tank.[19] As "tank boss," Ortiz dictated what other inmates in the tank could request from the jail commissary and dealt with the jail guards on behalf of the other inmates.[20] Ortiz took up residence in cell number three within the tank.[21] Jail guards placed Garcia in the tank about two weeks after Ortiz arrived.[22] Garcia lived in cell number five, along with an inmate named Mike Crenshaw ("Crenshaw").[23] Hernandez recalled that, when the guards brought Garcia into the tank, he saw Ortiz "freak" and immediately summon Garcia into cell number three.[24] Another inmate, Hector Hernandez, joined Ortiz and Garcia.[25] Mario Hernandez subsequently overheard Ortiz and Garcia engage in a heated exchange.[26] Ortiz expressed great concern that Garcia had been apprehended for certain bank robberies, and the men argued about whether Garcia's arrest resulted from his being incriminated by Garcia's girlfriend or Ortiz's wife.[27]

Hernandez testified that, to his knowledge, there were no narcotics in the tank before Ortiz was placed there.[28] After Ortiz arrived, Ortiz commented daily that he wanted to bring heroin into the jail.[29] Ortiz asked Hernandez once if he knew where Ortiz could "score" (*i.e.*, obtain drugs), but Hernandez did not have a telephone number.[30] Hernandez also overheard Ortiz make more than ten telephone calls, trying to sell a trailer in order to generate funds with which to purchase heroin.[31]

On the evening of the murder, during visiting hours, Ortiz succeeded in obtaining heroin.[32] Hernandez knew this because Paul Walker ("Walker"), the inmate who had accompanied Ortiz to visitation, told Hernandez that he and Ortiz had scored.[33] In addition, Mario, a heroin user himself, knew the signs of someone high on her-

---

confusion, in Part I of its Opinion, the Court refers to Mario Hernandez simply as "Hernandez." It will refer to the second witness, Hector Hernandez, merely as "Hector." Where the Court later discusses Hector Hernandez's testimony, in Part VII, *ante*, of its Opinion, the Court will refer to him as "Hernandez."

16. *Id.*, Rep. R., Vol. 31 of 37, at 123–26.

17. *Id.*, Rep. R., Vol. 31 of 37, at 125.

18. *Id.*, Rep. R., Vol. 31 of 37, at 148.

19. *Id.*, Rep. R., Vol. 31 of 37, at 135–45.

20. *Id.*, Rep. R., Vol. 31 of 37, at 138–143.

21. *Id.*, Rep. R., Vol. 31 of 37, at 155.

22. *Id.*, Rep. R., Vol. 31 of 37, at 148–49.

23. *Id.*, Rep. R., Vol. 31 of 37, at 169.

24. *Id.*, Rep. R., Vol. 31 of 37, at 152.

25. *Id.*, Rep. R., Vol. 31 of 37, at 153.

26. *Id.*, Rep. R., Vol. 31 of 37, at 155.

27. *Id.*, Rep. R., Vol. 31 of 37, at 155–57.

28. *Id.*, Rep. R., Vol. 31 of 37, at 159.

29. *Id.*, Rep. R., Vol. 31 of 37, at 160.

30. *Id.*

31. *Id.*, Rep. R., Vol. 31 of 37, at 161.

32. *Id.*, Rep. R., Vol. 31 of 37, at 166–67.

33. *Id.*, Rep. R., Vol. 31 of 37, at 166.

oin.[34] He stated that Ortiz and Walker were visibly under the drug's influence when they returned from the visitors booth.[35]

Upon Ortiz and Walker's return from visitation, Walker entered cell number five, the cell which Crenshaw and Garcia shared.[36] Garcia was not in his cell, but was playing cards at a table in the tank's common area.[37] Ortiz returned to his own cell for a minute or two, and afterward went to Garcia and Crenshaw's cell.[38] By that time, two additional inmates had joined Walker in cell number five.[39] The heroin had been brought to the cell as well.[40] The men called for Garcia to join them in the cell.[41]

Hernandez sat at a table in the tank's day room.[42] The table was about five feet away from the doorway to cell number five and Hernandez could see inside.[43] Hernandez recalled that Garcia was sitting on a bunk bed within the cell, surrounded by the four men.[44] Ortiz handed another inmate some black tar heroin to "cook" and the inmate dissolved the drug in water and drew the substance into a syringe.[45] The inmate handed the syringe to Ortiz.[46] Or-tiz looked at Garcia.[47] He took Garcia's arm.[48] Garcia turned away.[49] To Hernandez, it seemed that Garcia did not want to be injected.[50] Despite Garcia's posture, Ortiz nonetheless inserted the needle and emptied the syringe's contents into Garcia's arm.[51] Garcia immediately went into spasms as if he were overdosing.[52]

Hernandez's cellmate, identified only as "Davalos," noticed that Hernandez was closely watching the events inside cell number five and suggested that they return to their own cell.[53] While Hernandez and Davalos were heading back to their bunks, Hernandez witnessed Ortiz and another inmate lift Garcia, place him on the bottom bunk of the cell, and cover him with a blanket.[54] When Ortiz realized that Hernandez was watching his actions, Ortiz extinguished the lights in Garcia's cell.[55]

Ortiz, who normally did not associate with them, then invited Hernandez and Davalos to his cell and offered them heroin, which they accepted.[56] Ortiz stated that Garcia had overdosed and directed Hernandez and Davalos not to alert any-

---

34. *Id.*, Rep. R., Vol. 31 of 37, at 163–64.

35. *Id.*, Rep. R., Vol. 31 of 37, at 164–65.

36. *Id.*, Rep. R., Vol. 31 of 37, at 168–69.

37. *Id.*, Rep. R., Vol. 31 of 37, at 169.

38. *Id.*, Rep. R., Vol. 31 of 37, at 169–70.

39. *Id.*

40. *Id.*, Rep. R., Vol. 31 of 37, at 169.

41. *Id.*, Rep. R., Vol. 31 of 37, at 171.

42. *Id.*, Rep. R., Vol. 32 of 37, at 20.

43. *Id.*

44. *Id.*, Rep. R., Vol. 32 of 37, at 22.

45. *Id.*, Rep. R., Vol. 32 of 37, at 24–26.

46. *Id.*, Rep. R., Vol. 32 of 37, at 27.

47. *Id.*

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

52. *Id.*, Rep. R., Vol. 32 of 37, at 28–30.

53. *Id.*, Rep. R., Vol. 32 of 37, at 27.

54. *Id.*, Rep. R., Vol. 32 of 37, at 29–30.

55. *Id.*, Rep. R., Vol. 32 of 37, at 29.

56. *Id.*, Rep. R., Vol. 32 of 37, at 32–34.

one.[57] Instead, Ortiz told them that they should just let the guards find the body.[58] If, after the body was discovered, anyone asked them what had happened, Ortiz suggested that Hernandez and Davalos say only that Garcia had brought the heroin into the jail with him, been stingy with it, and injected it all himself.[59]

When the guards came the next morning to release the inmates from the tank for breakfast, Ortiz told them that Garcia was asleep and did not want to eat.[60] The guards left without checking on Garcia.[61] When the guards came to release the inmates for the next meal, Ortiz again told them that Garcia was sleeping.[62] The third time the guards came by, they entered Garcia's cell and discovered him dead.[63]

### 3. *Testimony of Hector Hernandez*

Hector Hernandez ("Hector") resided in the same tank as Ortiz and Garcia when the murder occurred.[64] Hector stated that he was not a Texas Syndicate member, but rather a prospect whom Ortiz was considering bringing into the organization.[65] Hector testified that, before the events in question, he had met Ortiz through his girlfriend's mother, Diane Najera, whose husband belonged to the gang.[66]

While on probation for burglary of a habitation, Hector was caught attempting to bring heroin into the jail for Ortiz.[67] The authorities subsequently charged Hector with possession of heroin and the State of Texas ("the State") moved to revoke his probation.[68] Ortiz arranged for Hector to be placed in the Texas Syndicate tank and the two men bunked together in cell number five.[69] Hector already knew Garcia well, due to having been incarcerated with him previously.[70] Garcia was in the tank when Hector arrived.[71] Hector had never seen Garcia use heroin.[72]

During the period in question, Ortiz returned from a meeting with law enforcement authorities believing that Garcia and Garcia's girlfriend had implicated him in certain bank robberies that he and Garcia had committed together.[73] Ortiz said that Garcia therefore must die.[74] According to Hector, Ortiz first planned to stab Garcia to death with a sharpened screwdriver.[75] However, Ortiz later opted to force Garcia

57. *Id.*

58. *Id.*, Rep. R., Vol. 32 of 37, at 34–35. Hernandez testified that, when he was first questioned by police detectives, he feared the consequences if he told the truth. *Id.*, Rep. R., Vol. 32 of 37, at 38–39. Hernandez stated that he therefore initially lied to the detectives, telling them the story Ortiz had suggested. *Id.*

59. *Id.*, Rep. R., Vol. 32 of 37, at 34.

60. *Id.*, Rep. R., Vol. 32 of 37, at 36.

61. *Id.*

62. *Id.*

63. *Id.*, Rep. R., Vol. 32 of 37, at 37.

64. *Id.*, Rep. R., Vol. 32 of 37, at 115.

65. *Id.*, Rep. R., Vol. 32 of 37, at 118.

66. *Id.*, Rep. R., Vol. 32 of 37, at 116, 117–19.

67. *Id.*, Rep. R., Vol. 32 of 37, at 115–56, 143–45, 154–55.

68. *Id.*

69. *Id.*, Rep. R., Vol. 32 of 37, at. 18–19, 124.

70. *Id.*, Rep. R., Vol. 32 of 37, at 119.

71. *Id.*

72. *Id.*, Rep. R., Vol. 32 of 37, at 129.

73. *Id.*, Rep. R., Vol. 32 of 37, at 121.

74. *Id.*

75. *Id.*, Rep. R., Vol. 32 of 37, at 125.

to take an overdose of "3 dimes" worth of heroin, so that the death would look like a suicide.[76] After Garcia's death, Ortiz told Hector to lie to the police about what happened.[77]

On cross-examination, Hector acknowledged that the State had dismissed the pending possession of heroin charge against him and had also agreed not to revoke his probation.[78] Although Hector gave conflicting statements regarding whether he had a deal with the State, he ultimately said he did not.[79]

### 4. Testimony of Detective Louie Carreon

Louie Carreon ("Carreon") stated that he was employed as a detective with the El Paso Police Department at all times relevant to this cause.[80] On August 6, 1997, Carreon was assigned to the Repeat Offender Program, which monitors individuals on parole and executes arrest warrants on individuals who have been accused of violating the terms of their release.[81] Officers in the Repeat Offender Program wear plainclothes and drive unmarked vehicles.[82] On August 7, 1997, Carreon executed an arrest warrant for Ricardo Ortiz.[83] Officers placed Ortiz in the back of a marked police car which had been called to the scene to transport Ortiz to jail.[84]

Ortiz knew Carreon from earlier interactions.[85] As Carreon walked by the squad car, Ortiz called out that he wanted to talk to him.[86] Carreon, who was busy preparing his arrest report, told Ortiz that he could not talk right then, but would talk with him later.[87] After they arrived at the station and Carreon finished his report, he met with Ortiz in an interview room.[88] Ortiz said that he would trade information about a bank robbery if the police would help him with his parole warrant.[89] Carreon relayed Ortiz's comments to an officer assigned to investigate robberies.[90]

### 5. Testimony of FBI Special Agent Thomas Lott

Special Agent Thomas Lott ("Lott") testified that, at the time of the events relevant to this cause, he was assigned to the Federal Bureau of Investigation's Violent Crime Squad, which among its other

---

76. Id., Rep. R., Vol. 32 of 37, at 132, 141. Hector testified that Garcia had told him more than once, both before they were in jail and while they were confined, that Garcia wanted to commit suicide for the crimes he had committed. Id., Rep. R., Vol. 32 of 37, at 142. Hector stated that Garcia told him that, before arriving at the jail, he had actually attempted to shoot himself, and that he planned to try again upon his release from jail. Id., Rep. R., Vol. 32 of 37, at 142–43.

77. Id., Rep. R., Vol. 32 of 37, at 124–25.

78. Id., Rep. R., Vol. 32 of 37, at 144–59.

79. Id. Hector Hernandez's testimony on this issue is set out in full in Part VII.A, ante, of this Opinion, as part of the Court's discussion of Ground Five of Ortiz's Petition.

80. State v. Ortiz, Trial Ct. No. 980D08993, Rep. R., Vol. 32 of 37, at 161 (test. of Det. Louie Carreon).

81. Id., Rep. R., Vol. 32 of 37, at 162.

82. Id., Rep. R., Vol. 32 of 37, at 164–65.

83. Id., Rep. R., Vol. 32 of 37, at 163.

84. Id., Rep. R., Vol. 32 of 37, at 166.

85. Id., Rep. R., Vol. 32 of 37, at 167.

86. Id., Rep. R., Vol. 32 of 37, at 166–67.

87. Id., Rep. R., Vol. 32 of 37, at 167–68.

88. Id., Rep. R., Vol. 32 of 37, at 168.

89. Id.

90. Id., Rep. R., Vol. 32 of 37, at 168–69.

duties, investigates bank robberies.[91] Specifically, Lott acted as the Violent Crime Squad's bank robbery coordinator.[92] Lott's duties included working with agents assigned to investigate bank robberies within his division and insuring that the information gleaned from their investigations was disseminated to Violent Crime Squads in other FBI divisions.[93] Lott stated that he and his squad were responsible for investigating three bank robberies committed in El Paso, Texas on July 25, 1997, July 30, 1997, and August 1, 1997.[94] From witnesses' accounts, Lott's team had reason to believe that the same Hispanic male had perpetrated all three robberies, while an accomplice waited outside in the get-away vehicle, a gray Mercury Cougar.[95]

On or about Wednesday, August 6, 1997, Lott received a telephone call from an El Paso Police Department sergeant.[96] The officer informed Lott that Ortiz, upon being arrested, had stated that he possessed information regarding an unspecified bank robbery.[97] Since Ortiz did not mention a particular bank robbery, Lott noted the call but did not immediately interview Ortiz.[98] Lott and his squad instead spent the next few days and weekend pursuing other leads.[99] They interviewed Garcia's ex-girlfriend, who said she believed Garcia was involved in the bank robberies.[100] She told them that Garcia had owned a gray Mercury Cougar, but had recently sold it to Ortiz.[101] She additionally recalled having seen Garcia, Ortiz, and Ortiz's wife counting money in Garcia's living room.[102]

Based on the information provided by Garcia's ex-girlfriend, Lott identified Garcia as a possible suspect.[103] After witnesses to the robberies selected Garcia from a photo lineup, Garcia became an official suspect.[104] Although Garcia's ex-girlfriend also implicated Ortiz in the robberies, after the interview with her, Lott felt that he still did not have enough evidence against Ortiz to charge him.[105] Lott therefore concocted a scheme, described below, to encourage Ortiz to talk to authorities.[106]

Garcia was already in custody at the jail for an unrelated matter.[107] Lott arranged for officers to bring Ortiz to the same holding area.[108] Lott hoped that when Ortiz and Garcia saw each other ostensibly talking to police officers, each man would assume that his accomplice was cooperating with the investigation, implicating the other in the robberies.[109] Lott said that

---

91. *State v. Ortiz,* Tr. Ct. No. 980D08993, Rep. R., Vol. 32 of 37, at 174–75 (test. of Special Agent Thos. Lott).

92. *Id.,* Rep. R., Vol. 32 of 37, at 175.

93. *Id.*

94. *Id.,* Rep. R., Vol. 32 of 37, at 177.

95. *Id.*

96. *Id.,* Rep. R., Vol. 32 of 37, at 178–79.

97. *Id.,* Rep. R., Vol. 32 of 37, at 179.

98. *Id.*

99. *Id.*

100. *Id.,* Rep. R., Vol. 32 of 37, at 180.

101. *Id.*

102. *Id.*

103. *Id.,* Rep. R., Vol. 32 of 37, at 181–82.

104. *Id.,* Rep. R., Vol. 32 of 37, at 184–85.

105. *Id.,* Rep. R., Vol. 32 of 37, at 185.

106. *Id.,* Rep. R., Vol. 32 of 37, at 187.

107. *Id.,* Rep. R., Vol. 32 of 37, at 185–86.

108. *Id.,* Rep. R., Vol. 32 of 37, at 187.

109. *Id.*

this was a routine and often effective tactic for securing statements and confessions.[110] Lott had officers take Ortiz back and forth past Garcia a couple of times, to ensure that the two men made eye contact, which they did.[111]

Lott and his team later prepared a criminal complaint charging Garcia with bank robbery.[112] Attached to the complaint was a probable cause statement, which specifically, but falsely, mentioned Ortiz as one of the individuals implicating Garcia in the robberies.[113] Lott and his investigators subsequently visited Ortiz at the jail to show him the documents.[114] Lott advised Ortiz that they were about to formally charge Garcia with bank robbery, and when they did so, Garcia would learn that Ortiz had "snitched him off."[115] Lott wanted to plant the thought in Ortiz's mind that Garcia would likely retaliate by implicating Ortiz.[116] Lott hoped that this realization would induce Ortiz to cooperate with the investigation.[117]

### B. Guilt–Innocence Phase—Ortiz's Case-in Chief

The defense rested without presenting evidence in Ortiz's defense. Ortiz did not testify.

110. *Id.*

111. *Id.,* Rep. R., Vol. 32 of 37, at 188.

112. *Id.,* Rep. R., Vol. 32 of 37, at 190.

113. *Id.,* Rep. R., Vol. 32 of 37, at 190–91.

114. *Id.,* Rep. R., Vol. 32 of 37, at 194.

115. *Id.*

116. *Id.,* Rep. R., Vol. 32 of 37, at 195.

117. *Id.,* Rep. R., Vol. 32 of 37, at 199–200. Although the record is silent on this point, Garcia's subsequent murder suggests that Lott's ploy backfired, with dire consequences

### C. Punishment Phase—The State's Case-in–Chief

The jury found Ortiz guilty of capital murder on June 16, 1999.[118] The punishment phase commenced directly thereafter.[119] The State presented evidence of several extraneous bad acts committed by Ortiz, which are set forth below. The State also presented testimony which familiarized the jury with the Texas Syndicate's structure and practices and illustrated the considerable influence a highly-placed member of the organization such as Ortiz could wield from prison.

#### 1. Testimony of Officer Enrique Venegas

As discussed in Section I.A.4, *supra,* of this Opinion, Detective Louie Carreon executed a warrant for Ortiz's arrest on August 7, 1997. Enrique Venegas, Jr. ("Venegas"), an El Paso County Police Department officer, testified that he assisted Carreon in executing the warrant.[120]

Venegas recalled that he and his partner were conducting surveillance in an area plagued by significant illegal drug activity when Carreon alerted them that Ortiz had been spotted nearby.[121] Carreon, who, like Venegas and his partner, was driving an unmarked unit, requested a marked unit to assist with Ortiz's apprehension.[122] Car-

for Garcia. Rather than deciding to cooperate with the investigation, Ortiz apparently chose to altogether foreclose Garcia's ability to testify against him.

118. *Id.,* Rep. R., Vol. 34 of 37, at 7–9.

119. *Id ..*

120. *State v. Ortiz,* Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 15–21 (test. of Off. Enrique Venegas, Jr.).

121. *Id.,* Rep. R., Vol. 34 of 37, at 15.

122. *Id.,* Rep. R., Vol. 34 of 37, at 17.

reon, Venegas, and Venegas's partner followed Ortiz in their unmarked units until Ortiz stopped his car at a red traffic light.[123] The officers then blocked Ortiz on all four sides.[124]

Venegas's vehicle was positioned at an angle behind Ortiz's car.[125] The officers began to leave their vehicles, showing their badges and identifying themselves as police officers.[126] As Venegas was getting out of his car, he observed Ortiz look over his shoulder.[127] To Venegas, it seemed that Ortiz was trying to see if he could escape by backing his car up.[128] Ortiz, still looking backward, subsequently put his car in reverse gear and attempted to drive it through a small space between the two police vehicles behind him.[129] As he backed up, Ortiz's car hit the driver's side door of Venegas's vehicle and pinned Venegas between the door and the side of the passenger compartment.[130] Ortiz saw that he had pinned Venegas, but did not stop his vehicle until other officers pointed their weapons at him and demanded that he surrender.[131] Venegas testified that he experienced pain in his shoulder and thigh

as a result of Ortiz's conduct, but did not receive medical attention for his injuries.[132]

### 2. Testimony of Onessimo Parra

Onessimo Parra ("Parra") testified that, from 1985 until 1990, he was a Texas Syndicate member.[133] Parra identified Ortiz and stated that in 1990, Ortiz invited him and three other Texas Syndicate members, Anthony Acosta ("Acosta"), Jimmy Rangel ("Rangel") and Martin Cardenas ("Cardenas"), to a cookout at Ortiz's house.[134] At some point, all five men left the party and drove in two cars to a small park in the desert surrounding El Paso, near Fabens, Texas.[135] They stayed there, drinking, for about fifteen minutes.[136] Ortiz took two hand guns from underneath the seat of his car and gave one to Cardenas.[137] Ortiz and Cardenas invited the three other men to go with them to kill rabbits and they all started walking into the desert.[138] When Acosta pulled a little ahead of Ortiz, Ortiz shot him two to three times in the back.[139] Acosta turned to face Ortiz, whereupon Ortiz shot him another two or three times in the stomach.[140] Ortiz left Acosta where he fell.[141] Meanwhile, Cardenas had shot

123. *Id.*

124. *Id.*

125. *Id.*, Rep. R., Vol. 34 of 37, at 18.

126. *Id.*

127. *Id.*

128. *Id.*, Rep. R., Vol. 34 of 37, at 18–19.

129. *Id.*

130. *Id.*

131. *Id.*, Rep. R., Vol. 34 of 37, at 19–20.

132. *Id.*, Rep. R., Vol. 34 of 37, at 20–21.

133. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 28, 38 (test. of Onessimo Parra). Parra was then serving a state sentence for burglary. *Id.*, Rep. R., Vol.

34 of 37, at 27. He told the jury on cross-examination that he been previously convicted of armed robbery, possession of marijuana, theft from a person, and driving under the influence of alcohol. *Id.*, Rep. R., Vol. 34 of 37, at 48–50.

134. *Id.*, Rep. R., Vol. 34 of 37, at 28–29.

135. *Id.*, Rep. R., Vol. 34 of 37, at 33–34.

136. *Id.*, Rep. R., Vol. 34 of 37, at 34.

137. *Id.*

138. *Id.*, Rep. R., Vol. 34 of 37, at 35.

139. *Id.*

140. *Id.*, Rep. R., Vol. 34 of 37, at 35–36.

141. *Id.*

Rangel twice in the back of the head.[142] The bodies had been "shot to pieces." [143] Ortiz asked Cardenas for the guns so that he could hide them.[144] Parra and Cardenas left together and returned to Ortiz's house.[145] Ortiz put the guns back in his car and took a different route.[146] Parra stated he knew beforehand that Acosta and Rangel were going to be murdered, and that their deaths were related to Texas Syndicate business.[147] Parra had no doubt, when he left, that Acosta and Rangel were dead.[148]

### 3. Testimony of Anthony Chavez

Anthony Chavez ("Chavez") testified that he became a Texas Syndicate member in 1989, while serving the end of a 12–year state prison sentence for robbery at the Texas Department of Criminal Justice's Darrington Unit ("Darrington Unit").[149] Chavez explained that prospects are recruited by active members and then investigated.[150] The active member of the organization invites a prospect to join and becomes the recruit's "padrino." [151] Chavez said there were several advantages to membership, including greater access to drugs and the outside world in general, as well as more control over one's immediate environment.[152]

Chavez was introduced to other organization members confined in the Darrington Unit, including Ortiz, who held the rank of "lieutenant." [153] Chavez recalled that Ortiz submitted requests for legal interviews with Chavez so that the two could talk privately in the same cell, ostensibly to discuss legal matters.[154] Instead, they discussed activities within the prison and goals that Texas Syndicate members wanted to accomplish.[155] Chavez stated that Ortiz was engaged in a power struggle with another Texas Syndicate lieutenant housed within the Darrington Unit.[156] Prison administrators had recently revoked certain of Ortiz's privileges, and Ortiz believed that the other lieutenant was responsible.[157] During their sessions, Ortiz schemed with Chavez to find a way to

---

142. *Id.*, Rep. R., Vol. 34 of 37, at 36.

143. *Id.*, Rep. R., Vol. 34 of 37, at 37.

144. *Id.*, Rep. R., Vol. 34 of 37, at 36.

145. *Id.*

146. *Id.*

147. *Id.*, Rep. R., Vol. 34 of 37, at 37.

148. *Id.* The State also presented the testimony of former El Paso County Sheriff Department Detective Jerry Keith ("Keith"), the officer who investigated the deaths of Acosta and Rangel. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 88 (test. of Det. Jerry Keith). Keith told the jury that two gunshot-riddled bodies, later identified as those of Acosta and Rangel, had been discovered near the San Felipe picnic area, which is just north of Fabens, Texas. *Id.*, Rep. R., Vol. 34 of 37, at 88–89. Their bodies were transported to the El Paso County Morgue, where the Chief Medical Examiner Contin conduct-ed the autopsies. *Id.*, Rep. R., Vol. 34 of 37, at 89–90. Keith recalled that no one was ever indicted for the murders. *Id.*, Rep. R., Vol. 34 of 37, at 98.

149. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 56–57 (test. of Anthony Chavez).

150. *Id.*, Rep. R., Vol. 34 of 37, at 57.

151. *Id.*, Rep. R., Vol. 34 of 37, at 58.

152. *Id.*, Rep. R., Vol. 34 of 37, at 59–60.

153. *Id.*, Rep. R., Vol. 34 of 37, at 61.

154. *Id.*, Rep. R., Vol. 34 of 37, at 62–63.

155. *Id.*, Rep. R., Vol. 34 of 37, at 64.

156. *Id.*, Rep. R., Vol. 34 of 37, at 65.

157. *Id.*, Rep. R., Vol. 34 of 37, at 64–65.

retaliate against his rival.[158]

Chavez and Ortiz were released from the Darrington Unit on the same day in 1990 and returned to San Angelo and El Paso, respectively.[159] Chavez was taken into custody again almost immediately upon his return to San Angelo, and thereafter communicated with Ortiz from jail by telephone.[160] The two had a telephone conversation during the summer of 1990, in which Ortiz ordered Chavez to kill an individual named Felix Benevides.[161] Ortiz promised to "take care" of Acosta.[162] Chavez understood Ortiz to mean that Ortiz would either kill Acosta himself or arrange for someone else to do it.[163] After Chavez's release from jail, he called Ortiz again, only to be told by Ortiz's father that Ortiz was in jail for capital murder.[164]

Chavez stated that he left the Texas Syndicate in 1992 or 1993, after the following incident.[165] While Chavez was incarcerated in the county jail, he received a telephone call from Ortiz.[166] Ortiz told him that Frank Gora ("Gora"), another active Texas Syndicate member, was also in the jail.[167] Gora was facing a number of charges and wanted to escape.[168] Ortiz instructed Chavez to treat Gora with re-spect and like a brother because Gora was a Texas Syndicate member.[169] Chavez complied and assisted Gora in his escape attempt.[170] For his aid, Chavez received a 45-year sentence for attempted capital murder.[171]

Upon commencing his sentence in the Texas Department of Justice, McConnell Unit ("McConnell Unit"), Chavez learned that Gora was not a Texas Syndicate member after all, but a member of a rival gang, the Mexican Mafia.[172] Chavez was then subject to the displeasure of other Texas Syndicate members in the McConnell Unit, who criticized him for helping a member of a rival organization.[173]

As an additional reason for leaving the organization, Chavez related that, while on release from jail, he had been ordered to kill someone but had not done so.[174] When he returned to jail, the organization therefore assigned him to kill someone else.[175] Chavez foresaw "a big old wreck" coming and decided to leave the gang.[176]

Chavez encountered Ortiz again in 1995, when Ortiz was also placed in the McConnell Unit.[177] Ortiz threatened Chavez, calling him a "snitch."[178] Ortiz warned Chavez that if Chavez said anything about

158. *Id.*

159. *Id.*, Rep. R., Vol. 34 of 37, at 66.

160. *Id.*

161. *Id.*, Rep. R., Vol. 34 of 37, at 65–66.

162. *Id.*

163. *Id.*, Rep. R., Vol. 34 of 37, at 66–67.

164. *Id.*, Rep. R., Vol. 34 of 37, at 68.

165. *Id.*

166. *Id.*

167. *Id.*

168. *Id.*, Rep. R., Vol. 34 of 37, at 68–69.

169. *Id.*

170. *Id.*, Rep. R., Vol. 34 of 37, at 69.

171. *Id.*

172. *Id.*

173. *Id.*

174. *Id.*

175. *Id.*

176. *Id.*

177. *Id.*, Rep. R., Vol. 34 of 37, at 70–71.

178. *Id.*, Rep. R., Vol. 34 of 37, at 71.

Acosta (*i.e.*, one of the men Ortiz allegedly murdered in the desert near Fabens, Texas) or anything else implicating Ortiz in criminal behavior, Ortiz "would catch up to" him.[179] Ortiz reminded Chavez that he knew where Chavez's family lived and emphasized that Chavez should remember that fact.[180] Chavez told the jury that gang members who inform on other members—particularly, higher ranking members—are killed.[181]

### 3. Testimony of Enrique Franco

Enrique Franco ("Franco"), Security Threat Groups Coordinator for Region III of the Texas Department of Criminal Justice, Institutional Division, testified as an expert in the field of gang intelligence.[182] Franco explained that the Texas Syndicate is a prison-based inmate gang, existing throughout the Texas state prison system and on the streets of many states, including Texas.[183] He further informed the jury that the Texas Syndicate is considered the most highly-structured, aggressive, and violent prison gang.[184] The gang is organized by rank into the categories of president, vice president, lieutenants, captains, majors, sergeants, and soldiers.[185] Its members are known for their extremely strong loyalty to the organization and readiness to follow, to the letter, any order

given by higher ranking members.[186] To kill someone outside of prison, a Texas Syndicate member would merely have to contact his members on the street and order them to carry out the murder.[187] Franco told the jury that Ortiz held the third-highest rank of lieutenant and was known as a very violent person.[188]

### 4. Evidence of Ortiz's Prior Adjudicated Offenses

In addition to testimonial evidence of Ortiz's extraneous bad acts, the States submitted his "pen packet" or record of prior adjudicated offenses into evidence.[189] The evidence was offered to show the jury that Ortiz had been previously convicted of aggravated robbery, possession of a deadly weapon in a penal institution, burglary of a vehicle, and simple robbery.[190] It additionally showed numerous disciplinary infractions committed by Ortiz while incarcerated.[191]

### C. Punishment Phase—Ortiz's Case-in-Chief

The State rested its punishment case-in-chief late on June 16, 1999.[192] Ortiz's lead counsel, Jaime Gandara, thereafter requested a short recess in which to confer with his client.[193] When the proceedings reconvened and the court asked Gandara

---

179. *Id.*

180. *Id.*

181. *Id.*

182. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 129–30 (test. of Enrique Franco).

183. *Id.*, Rep. R., Vol. 34 of 37, at 130.

184. *Id.*

185. *Id.*, Rep. R., Vol. 34 of 37, at 135.

186. *Id.*, Rep. R., Vol. 34 of 37, at 130–31.

187. *Id.*, Rep. R., Vol. 34 of 37, at 131.

188. *Id.*, Rep. R., Vol. 34 of 37, at 132–33.

189. *Id.*, Rep. R., Vol. 34 of 37, at 109–117; *see also* Rep. R., Vol. 37 of 37 (State's Ex. 30–33).

190. *See also* Rep. R., Vol. 37 of 37 (State's Ex. 30–33).

191. *Id.*

192. *See* Rep. R., Vol. 34 of 37, at 138.

193. *Id.*

to call his first witness, Gandara announced that the defense would rest.[194]

The next day, outside the presence of the jury and before charging it, the trial judge addressed Ortiz, asking whether it had been his decision not to testify at the guilt-innocence or punishment phases of the trial.[195] Ortiz replied that it was his decision not to testify.[196] The trial judge also noted that Gandara, after consulting with his client at the close of the State's case, had abandoned his apparent plan to present witnesses at the punishment phase to testify on Ortiz's behalf.[197] The trial judge asked Gandara to articulate for the record whether his decision was part of his trial strategy. Gandara stated:

> Your Honor, we had witnesses for the punishment phase. And after consultation with Mr. Ortiz, we made a decision that for various reasons, including trial tactics, that it would be best not to put up any witnesses. And there were some strong reasons for it besides trial tactics, some strong personal reasons on Mr. Ortiz's part. But all those things were taken into consideration, and that was done after consultation with my client, and Mr. Munoz [co-counsel], of course.[198]

Ortiz confirmed Gandara's account of the facts surrounding the decision not to call witnesses and told the court that he was satisfied with Gandara's representation.[199]

On June 17, 1999, the jury returned with its answers to the special questions required under Texas law.[200] It found beyond a reasonable doubt that: (1) Ortiz would probably commit criminal acts of violence in the future and constitute a continuing threat to society; and (2) there were no sufficiently mitigating circumstances to warrant life imprisonment rather than a death sentence.[201] Accordingly, the trial court sentenced Ortiz to death.[202]

194. *Id.*

195. *Id.*, Rep. R., Vol. 35 of 37, at 7–8.

196. *Id.*, Rep. R., Vol. 35 of 37, at 8.

197. *Id.*

198. *Id.*

199. *Id.*

200. Texas Code of Criminal Procedure article 37.071 § 2(b) directs the trial court to submit the following issues to the jury at the close of evidence in the punishment phase of a capital case:
> (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party ... whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

*Id.* at § 2(b) (West Supp.2004). If the jury returns an affirmative finding to each issue submitted under 37.071 § 2(b), it must then decide the following issue:
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1) (West Supp.2004). Because the charge administered at the guilt-innocence phase of Ortiz's trial did not allow the jury to find Ortiz guilty of capital murder as a party, at the punishment phase, the jury was therefore not required to answer the question posed in article 37.071 § 2(b)(2).

201. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 35 of 37, at 60.

202. *Id.*, Rep. R., Vol. 35 of 37, at 63.

## D. Subsequent Procedural History

Ortiz was convicted and sentenced to death for the capital murder of Garcia in the 243rd Judicial District Court of El Paso County, Texas, the Honorable David C. Guaderrama presiding. Ortiz filed a Motion for New Trial, which was denied after a hearing convened on September 3, 1999. Ortiz's capital murder conviction was automatically appealed to the Texas Court of Criminal Appeals ("Court of Criminal Appeals"), which affirmed his conviction and sentence in a published opinion issued on September 25, 2002.[203] The Supreme Court of the United States denied Ortiz's petition for a writ of certiorari in an order dated April 28, 2003.[204]

Ortiz filed a state application for writ of habeas corpus with the trial court on March 8, 2002.[205] On November 25, 2002, the trial court entered findings of fact and conclusions of law, recommending that the Court of Criminal Appeals deny relief.[206] The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law and denied Ortiz's state application in an order dated January 22, 2003.[207]

Ortiz filed his "Petition for a Writ of Habeas Corpus By a Person in State Custody (28 U.S.C. § 2254)" ("Petition") and "Brief in Support of Petition for a Writ of Habeas Corpus By a Person in State Custody (28 U.S.C. § 2254)" ("Brief") on February 9, 2004. Respondent's "Answer and Motion for Summary Judgment With Brief in Support" ("Answer") followed on May 14, 2004. Ortiz did not file a Reply.

## E. Ortiz's Claims for Federal Habeas Corpus Relief

In his Petition, Ortiz asserts seven claims for relief, which the Court summarizes. First, Ortiz argues that the trial court improperly excluded qualified veniremembers from jury service because they objected to or voiced conscientious scruples against capital punishment ("Ground One"). Second, Ortiz contends that lead counsel Gandara rendered ineffective assistance when he failed to prevent the exclusion of the aforementioned veniremembers ("Ground Two"). Third, Ortiz charges that Gandara rendered ineffective assistance because he failed to adequately investigate and did not present any evidence in mitigation of his client's punishment ("Ground Three"). Fourth, Ortiz alleges that the State failed to disclose evidence suggesting that prosecution witness Hector Hernandez testified against Ortiz in exchange for the State's promise to treat Hernandez leniently in a collateral criminal matter ("Ground Four"). Fifth, Ortiz avers that the State violated the *Ex Post Facto* Clause of the federal constitution by prosecuting him under a version of Texas's retaliation statute that was not enacted until after the date on which Ortiz murdered Garcia ("Ground Five"). Sixth, Ortiz alleges that he was denied a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant the imposition of a life sentence rather than the

---

**203.** *Ortiz v. State,* 93 S.W.3d 79 (Tex.Crim. App.2002).

**204.** *Ortiz v. Texas,* 538 U.S. 998, 123 S.Ct. 1901, 155 L.Ed.2d 824 (2003).

**205.** Resp't's Answer & Mot. for Summ. J. With Br. In Supp. (hereinafter, "Resp't's Answer") 3.

**206.** *Ex parte Ortiz,* No. 54, 488–01 (Tex.Crim. App.2003) (*per curiam* ) (unpublished order), Tr. Ct.'s Find. of Fact & Concl. of Law, at cover.

**207.** *Ex parte Ortiz,* No. 54, 488–01 (Tex.Crim. App.2003) (*per curiam* ) (unpublished order).

death penalty, in violation of *Ring*[208] and *Apprendi*[209] ("Ground Six"). Lastly, Ortiz attacks Texas's capital sentencing scheme, arguing that it precluded the jury from considering evidence of his character in mitigation of punishment ("Ground Seven").

This Court may not reach the merits of any claims that Ortiz has procedurally forfeited.[210] Here, Respondent contends that Ortiz has forfeited his allegations raised under Ground One as to all prospective jurors except Anna Doporto. Accordingly, the Court first discusses the standard for procedural default and examines whether any portion of Ground One falls victim to the procedural bar. After such analysis, the Court will consider the merits of any of Ortiz's claims that are properly before it.

## II. PROCEDURAL DEFAULT

In his Ground One of his Petition, Ortiz argues that the trial court excluded the following nineteen members of the venire panel from jury service, in violation of the Sixth and Fourteenth Amendments to the federal constitution: (1) Andy O. Reid ("Reid"); (2) Elizabeth Bonilla ("Bonilla"); (3) Ana Maria Ramirez ("Ramirez"); (4) Chris Berlit ("Berlit"); (5) Diana Reta ("Reta"); (6) Yvonne Lopez ("Lopez"); (7) Jeffrey Herrick ("Herrick"); (8) Ann Marie Parra ("Parra"); (9) Roberta Jane Vera ("Vera"); (10) Robert Escamilla ("Escamilla"); (11) Dolores Cortinas ("Cortinas"); (12) Andre Estala ("Estala"); (13) Jorge Portillo ("Portillo"); (14) Rose Gallegos ("Gallegos"); (15) Rosa M. Palomo ("Palomo"); (16) Lydia Santoscoy ("Santoscoy"); (17) Manuel Ruiz ("Ruiz"); (18) Anna Doporto ("Doporto"); and (19) Adriana Caballero ("Caballero").[211] As noted previously, Respondent contends that Ortiz has procedurally defaulted Ground One as to all prospective jurors except Anna Doporto. After due consideration, the Court agrees.

Procedural default occurs in two contexts, which are set forth below.[212] In either circumstance, the petitioner is considered to have forfeited his federal habeas claim.[213]

### A. Procedural Default Due to Failure to Exhaust Available State Court Remedies

Under 28 U.S.C. § 2254(b)(1)(A), a court shall not grant habeas relief unless "the

---

**208.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**209.** *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435(2000).

**210.** *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

**211.** *See* Pet'r's Br. 10–25. In Ortiz's Brief, Ortiz does not list the names of the jurors whom he contends the trial court improperly excluded. Rather, Ortiz sets forth seventeen pages of the venire transcript for the Court to wade through in search of those names. The Court notes that, while the transcript is helpful, it would better serve Ortiz to expressly state the jurors' names in the body of his argument in lieu of, or in addition to, quoting from the record.

As Respondent observes, the portion of the voir dire transcript set forth by Ortiz includes the individual questioning of twenty (rather than nineteen) prospective jurors, including an individual named Alicia Paredes. It is clear from the transcript, however, that Paredes was not excluded from jury service due to her views on the death penalty. Because Ortiz refers to nineteen jurors that were improperly excluded from jury service, the Court agrees with Respondent that Paredes was mistakenly included by Ortiz. It further finds that any such challenge to the exclusion of Paredes is unexhausted and procedurally defaulted. In any event, the Court will discuss Paredes no further.

**212.** *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

**213.** *O'Sullivan,* 526 U.S. at 848, 119 S.Ct. 1728.

applicant has exhausted the remedies available in the courts of the State." [214]

The requirements of the exhaustion concept are simple: An applicant must fairly apprise the highest court of his state of the federal rights which were allegedly violated. Further, the applicant must present his claims in a procedurally correct manner. If, for whatever reason, an applicant bypasses the appellate processes of his state—whether through procedural default or otherwise—he will *not* be deemed to have met the exhaustion requirement absent a showing of one of two particulars. He must either demonstrate cause and prejudice *or* show that the failure to consider his claims will result in a fundamental miscarriage of justice. [215]

Thus, Ortiz will have satisfied the exhaustion requirement only if he "fairly present[ed]" his issues to Texas courts. [216]

■ To have fairly presented his claim to state courts, a petitioner seeking federal habeas corpus relief must have referred to a specific federal constitutional guarantee in his arguments before the state courts and provided them with a specific state-

ment of the facts entitling him to relief. [217] "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." [218]

[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so. [219]

Here, therefore, Ortiz will have failed to exhaust his claims if he presents new legal theories or factual claims in his federal habeas petition which he failed to present in his state court appeals. [220]

## B. Procedural Default on an Adequate and Independent State Law Ground

Because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," the requirement is satisfied "if it is clear that [the habeas petitioner's] claims are now

---

**214.** *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir.2001); *accord Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004).

**215.** *Beazley*, 242 F.3d at 263 (emphasis in original) (quoting *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir.1993)).

**216.** *Picard v. Connor*, 404 U.S. 270, 275–6, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (explaining that state courts must have been afforded an opportunity to hear and dispose of the same claim the petitioner urges upon federal courts); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir.2001) (stating that a petitioner must have fairly presented the substance of his claim to the state courts).

**217.** *Gray v. Netherland*, 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (explaining that a petitioner's general appeal to a

constitutional guarantee as broad as due process does not sufficiently present the substance of such a claim to a state court).

**218.** *Wilder*, 274 F.3d at 259–60 (citing *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)).

**219.** *Baldwin*, 541 U.S. at 32, 124 S.Ct. 1347.

**220.** *See Anderson*, 459 U.S. at 6–7, 103 S.Ct. 276 (explaining it is not enough for purposes of the exhaustion requirement that a petitioner made a somewhat similar state law claim or that all the facts necessary to support the federal claim were before the state courts); *see also Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir.1983) (discussing the exhaustion requirement and stating that, to satisfy the fair presentation standard, it is not enough that the petitioner has merely been through the state courts).

procedurally barred under [state] law." [221] However, the procedural bar that gives rise to exhaustion also provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim unless the petitioner can demonstrate cause and prejudice for failing to present the claim to the state courts.[222] "The existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." [223] "Objective factors that constitute 'cause' include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel." [224]

To satisfy the "independent" and "adequate" requirement referenced above, the state court's dismissal of the petitioner's claim must "clearly and expressly" indicate that it rests on state grounds which bar relief.[225] The state courts must follow the bar strictly and regularly and apply it to a majority of similar claims.[226] The rule applies to both state court judgments rendered on substantive bases and to those rendered on procedural grounds.[227]

Where there has been one reasoned state judgment rejecting a petitioner's federal claim and it is followed by summary state court orders upholding that judgment or rejecting the same federal claim, a federal reviewing court presumes that the subsequent state court rulings rest upon the same ground.[228]

With the foregoing principles in mind, the Court considers whether Ortiz has procedurally defaulted Ground One of his Petition.

*C. By Failing to Preserve Error at Trial, Ortiz Procedurally Defaulted Ground One Under State Law as to Prospective Jurors Berlit, Reta, Lopez, Herrick, Parra, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palermo, Caballero, Redi, and Bonilla.*

■ On direct appeal, Ortiz challenged the exclusion of the following fifteen prospective jurors: Berlit, Reta, Lopez, Herrick, Parra, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palermo, Caballero, Redi, Bonilla, and Doporto.[229] The Court of Criminal Appeals determined that, with the exception of Doporto, Ortiz had failed to object at trial to the exclusion of any of these individuals from jury service.[230] It

---

**221.** *Gray*, 518 U.S. at 161–62, 116 S.Ct. 2074 (citing *Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).

**222.** *Gray*, 518 U.S. at 162, 116 S.Ct. 2074; *Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

**223.** *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

**224.** *McCleskey v. Zant*, 499 U.S. 467, 493–94, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (internal quotation marks and citation omitted).

**225.** *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir.2001).

**226.** *Id.*

**227.** *Id.*

**228.** *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Finley*, 243 F.3d at 218.

**229.** Resp't's Answer 11.

**230.** *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim.App.2002).

reasoned that Ortiz's failure to lodge a contemporaneous objection, a prerequisite under state law for appellate review, thus also failed to preserve error and waived the claim as to all prospective jurors except Doporto.[231]

This Court may not review Ortiz's federal habeas claim on the merits if the Court of Criminal Appeals expressly and unambiguously based its denial of relief on Ortiz's procedural default under state law.[232] Here, the Court of Criminal Appeals stated that "because Ortiz failed to object [to the exclusion of prospective jurors Berlit, Reta, Lopez, Herrick, Parra, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palermo, Caballero, Redi, and Bonilla], his complaints were not preserved with respect to [any of the excluded prospective jurors]

except for the complaint regarding [Doporto]." [233] The Court concludes that the Court of Criminal Appeals' decision set forth with requisite clarity that its denial of relief rested on state law grounds, specifically, Ortiz's failure to lodge a contemporaneous objection to the exclusion of any juror except Doporto.[234] As the procedural bar to review rests on independent and adequate state law grounds and Ortiz has failed to show that some factor external to the defense interfered with his ability to object at trial, the Court finds that Ortiz is not entitled to federal review of Ground One, inasmuch as he alleges that Berlit, Reta, Lopez, Herrick, Parra, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palermo, Caballero, Redi, and Bonilla were unconstitutionally excluded from jury service.

231. *Id.*

232. *See Sochor v. Florida,* 504 U.S. 527, 534, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (stating that a federal court lacks jurisdiction to review a state court's resolution of an issue of federal law if the state court's decision rests on an independent and adequate state law ground, which it will if the state court's opinion indicates clearly and expressly that the state ground is an alternative holding); *Coleman,* 501 U.S. at 729, 111 S.Ct. 2546 (explaining that a federal court will not review a question of federal law decided by a state court if the state court's decision rests on a state substantive or procedural law ground that is independent of the federal question and adequate to support the judgment); *Harris v. Reed,* 489 U.S. 255, 265, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (extending the "adequate and independent state law grounds" doctrine to federal habeas cases and applying the "plain statement" rule to determine whether a state court's decision rested on an adequate and independent state law ground, thus barring federal review); *Amos v. Scott,* 61 F.3d 333, 338 (5th Cir.1995) (noting the applicability of the adequate and independent state law ground doctrine to federal law claims that were raised on direct review or in a state application for habeas corpus relief and examining the "requisite clarity" required to support a federal district court's

finding that a state court's decision expressly rested on independent and adequate state law grounds).

233. *Ortiz v. State,* 93 S.W.3d at 88–89.

234. *See Amos,* 61 F.3d at 340–41 (expressly rejecting the argument that Texas's contemporaneous objection rule does not constitute an adequate and independent state law basis for the denial of relief and does not preclude collateral review by federal courts); *see also Sochor,* 504 U.S. at 534, 112 S.Ct. 2114 (holding that a state court's opinion stating that none of the petitioner's complained-of jury instructions were objected to at trial and were therefore not preserved for appeal, as well as stating that the petitioner's claim lacked merit, indicated with requisite clarity that the state court based its rejection of the petitioner's claim on the alternative, independent and adequate state law ground); *Foster v. Johnson,* 293 F.3d 766, 790 (5th Cir.2002) (concluding that the state supreme court's statement that the petitioner's Eighth Amendment claim was "procedurally barred, and alternatively, found to be without merit" constituted a sufficiently clear and express articulation that the state procedural ground was an independent basis for that court's decision).

*D. Under State Law, Ortiz Procedurally Defaulted His Claims Regarding Prospective Jurors Ramirez, Vera, Santoscoy, and Ruiz by Failing to Challenge Their Exclusion in His Direct Appeal.*

In his direct appeal, Ortiz did not challenge the exclusion of prospective jurors Ramirez, Vera, Santoscoy, and Ruiz. Rather, he raised claims concerning the exclusion of these four prospective jurors for the first time in his state habeas application.

The Court of Criminal Appeals was the last state court to consider the claim. In a brief *per curiam* order, that court merely stated that it adopted the trial judge's findings of fact and conclusions of law.[235] This Court has therefore "looked through" the Court of Criminal Appeals' summary dismissal to find the last state court to enter a reasoned opinion on the issue.[236] Here, that is the state habeas court, which issued detailed findings of fact and conclusions of law regarding Ortiz's state application for habeas corpus relief.

The state habeas court determined that, although Ortiz lodged a contemporaneous objection to Santoscoy's exclusion, he failed to obtain a ruling from the trial court.[237] The state habeas court additionally found that Ortiz did not object to Ramirez's, Vera's, or Ruiz's exclusion.[238] The state habeas court further ascertained that Ortiz could have raised his claim concerning these four prospective jurors on direct appeal, but did not.[239] It concluded that Ortiz's claims regarding these jurors were therefore barred by the state law requirement precluding collateral review of all claims that could have been raised on direct appeal, but were not.[240]

■ The Court finds that the state habeas court clearly and expressly indicated that its conclusions and concomitant recommendation that the Court of Criminal Appeals deny relief on Ortiz's claim rested on independent and adequate state law grounds.[241] The Court moreover finds that Ortiz has failed to show cause sufficient to overcome the procedural bar to federal review. The factual and legal bases for Ortiz's claims regarding Ramirez's, Vera's, Santoscoy's, and Ruiz's exclusion were manifestly available at the time of Ortiz's trial and direct appeal, and he has failed to show that any factor external to the defense impeded his ability to raise them at the appropriate point in the proceedings.

Having determined that Ortiz is not entitled to federal review of Ground One to the extent he alleges that prospective jurors Reid, Bonilla, Ramirez, Berlit, Reta, Lopez, Herrick, Parra, Vera, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palomo, Santoscoy, Ruiz, and Caballero were

---

235. *Ex parte Ortiz,* No. 54,488–01 (Tex.Crim. App.2003) (*per curiam*) (unpublished order).

236. *See Ylst,* 501 U.S. at 804 & 804 n. 3, 111 S.Ct. 2590 (explaining that, as applied to an unexplained order of a higher state court order leaving in effect the findings or conclusions of a subordinate state court, a presumption which gives the unexplained order no effect, by simply "looking through" it to the last reasoned decision, most nearly reflects the role that such cursory orders are meant to play).

237. *Ex parte Ortiz,* No. 54,488–01 (Tex.Crim. App.2003) (*per curiam*) (unpublished order), Tr. Ct.'s Find. of Fact & Concl. of Law, at ¶ 87.

238. *Id.* at ¶ 48 (Ramirez), ¶ 66 (Vera), ¶ 90 (Ruiz).

239. *Id.* at ¶¶ 97–103.

240. *Id.*

241. *See Sochor,* 504 U.S. at 534, 112 S.Ct. 2114; *Foster,* 293 F.3d at 790.

improperly excluded from jury service due to their views regarding capital punishment, the Court now turns to the legal standard governing its merits review of Ortiz's claims that are properly before the Court.

### III. APPLICABILITY OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

Because Ortiz filed his federal habeas corpus action after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), insofar as the state courts adjudicated his present claims on the merits, the AEDPA governs the Court's review.[242]

Under the applicable standard of review, the Court cannot grant Ortiz federal habeas corpus relief in this cause concerning any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[243]

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) carry independent meanings.[244] Under the "contrary to" clause, a federal habeas court may grant relief only if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.[245] A state court's failure to cite governing Supreme Court authority does not, by itself, establish that the state court's decision runs contrary to clearly established federal law.[246] A state court need not even be aware of governing

242. *See Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (explaining that, because the petitioner filed his federal habeas petition after the enactment date of the AEDPA, the AEDPA's provisions governed the scope of judicial review); *Lindh v. Murphy,* 521 U.S. 320, 336–37, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding that the AEDPA's provisions apply to cases filed after the legislation's effective date of April 24, 1996); *United States v. Orozco–Ramirez,* 211 F.3d 862, 865–66 (5th Cir.2000) (stating that the AEDPA's provisions apply to habeas corpus applications pending upon or filed after the legislation's effective date of April 24, 1996).

243. 28 U.S.C.A. § 2254(d) (West 2004); *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Price v. Vincent,* 538 U.S. 634, 639, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

244. *See Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (stating that, as clarified by Supreme Court precedent, the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) possess independent meaning); *Williams,* 529 U.S. at 404–05, 120 S.Ct. 1495 (establishing that the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) are accorded independent meanings).

245. *See Price,* 538 U.S. at 640, 123 S.Ct. 1848 ("A decision by a state court is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "); *Bell,* 535 U.S. at 694, 122 S.Ct. 1843 ("A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.").

246. *Mitchell v. Esparza,* 540 U.S. 12, 16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003).

federal precedent, so long as neither the state court's reasoning nor the result it reaches contradicts that authority.[247]

■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreason- ably applies that principle to the facts of the petitioner's case.[248] A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable," as opposed to merely incorrect.[249] A legal principle is "clearly established" for purposes

**247.** *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (emphasizing that § 2254(d) authorizes a federal habeas court to review only the state court's decision and not the written opinion explaining that decision); *Neal v. Puckett;* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (stating that, in conducting its "unreasonable application" analysis under § 2254(d), a federal habeas court should concentrate on the state court's ultimate legal conclusion and whether that determination was objectively unreasonable, and not question whether the state court considered and discussed every angle of the evidence).

**248.** *See Wiggins,* 539 U.S. at 520, 123 S.Ct. 2527 ("The 'unreasonable application' prong of § 2254(d)(1) permits a federal court 'to grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. In other words, a federal court may grant relief when a state court has misapplied 'a governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'"); *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the governing legal standard] incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [the relevant standard] to the facts of his case in an objectively unreasonable manner."); *Bell,* 535 U.S. at 694, 122 S.Ct. 1843 ("The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and

we stressed in *Williams* [*v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one."); *Penry,* 532 U.S. at 792, 121 S.Ct. 1910 ("A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.' Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable."); *Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495 ("First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.") In *Williams,* the Supreme Court expressly reserved for another day the issue of how federal habeas courts should determine whether a state court erroneously extended a legal principle into a new realm or erroneously refused to extend existing legal principle into a new area. *See Williams,* 529 U.S. at 408–09, 120 S.Ct. 1495.

**249.** *See Wiggins,* 539 U.S. at 520–21, 123 S.Ct. 2527 (explaining that a state court's application of Supreme Court precedent must have been more than incorrect or erroneous for a federal court to find that the application was "unreasonable" under § 2254(d)(1)); *Price,* 538 U.S. at 640, 123 S.Ct. 1848 (citing *Bell* and *Williams* for the proposition that a

of AEDPA review if, when the state court reached its result on a point of law, a Supreme Court decision's holding established the principle at issue.[250]

█ It is the petitioner's burden to show that the state court applied clearly established federal law to the facts of his case in an objectively unreasonable manner.[251] Moreover, the AEDPA significantly restricts the scope of federal habeas review of state court factual findings, requiring a petitioner who challenges a state court's factual findings to establish by clear and convincing evidence that the state court's findings were erroneous.[252]

The Seventh Circuit Court of Appeals has provided a helpful explication of this standard:

> state court's application of federal law must be more than merely erroneous to represent an "unreasonable" application); *Woodford,* 537 U.S. at 25, 123 S.Ct. 357 (admonishing federal courts against granting habeas corpus relief merely because they conclude, in their independent judgment, that a state court applied a governing federal legal standard incorrectly); *Penry,* 532 U.S. at 793, 121 S.Ct. 1910 (emphasizing that a grant of federal habeas relief is only appropriate when the petitioner shows that the state court's application of federal law was objectively unreasonable, rather than merely incorrect); *Bell,* 535 U.S. at 694, 122 S.Ct. 1843 (stressing that an objectively unreasonable application of federal law is distinguishable from an application that is simply erroneous); *Williams,* 529 U.S. at 411–12, 120 S.Ct. 1495 (contrasting a state court's incorrect legal conclusion from one that is unreasonable within the meaning of § 2254(d)(1)).

**250.** *See Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").

**251.** *Price,* 538 U.S. at 640, 123 S.Ct. 1848.

**252.** *See* 28 U.S.C.A. § 2254(e)(1) (West 2005 rev.) ("In a habeas proceeding instituted by an application for a writ of habeas corpus by

How then should federal courts distinguish between reasonably and unreasonably erroneous applications of clearly established Supreme Court precedent? The standard favors conventionalism over formalism. Which is to say, it takes for granted that for a given set of facts, there exists the possibility of several equally plausible outcomes. Our task is to uphold those outcomes that comport with recognized conventions of legal reasoning and set aside those which do not.

Unreasonableness also serves as the touchstone against which state court decisions based on determinations of fact in light of the evidence presented are evaluated. As is the case under

a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Foster v. Johnson,* 293 F.3d 766, 776 (5th Cir.2002) (explaining that, to be entitled to relief under 28 U.S.C. § 2254(d)(2), a petitioner must rebut the state court's factual determinations by clear and convincing evidence to the contrary); *Rudd v. Johnson,* 256 F.3d 317, 319 (5th Cir.2001) ("The presumption [that a state habeas court's factual findings are correct] is particularly strong when the state habeas court and the trial court are one and the same."); *Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir.2000) (stating that, absent an unreasonable determination of the facts in light of the record, a reviewing federal court should defer to a state court's factual findings); *Hernandez v. Johnson,* 108 F.3d 554, 558, 558 n. 4 (5th Cir.1997) (holding that, under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts, "where it belongs," and recognizing that the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court").

§ 2254(d)(1), a petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error. And § 2254(e)(1) provides a mechanism by which the petitioner can prove that unreasonableness. If the petitioner can show that the state court determined the underlying factual issue against the clear and convincing weight of the evidence, the petitioner has not only established that the court committed error in reaching a decision based on that faulty factual premise, but has also gone a long way towards proving that it committed unreasonable error. A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision "so inadequately supported by the record" as to be arbitrary and therefore objectively unreasonable.[253]

With the foregoing principles in mind, the Court turns to the merits of Ortiz's remaining claims for federal habeas corpus relief.

## IV. CLAIM ONE: THE TRIAL COURT IMPROPERLY EXCLUDED PROSPECTIVE JUROR ANNA DOPORTO FROM JURY SERVICE DUE TO HER VIEWS ON CAPITAL PUNISHMENT

Ortiz contends that the trial court improperly excluded prospective juror Doporto from jury service.[254] On direct appeal, the Court of Criminals Appeals determined that Ortiz had not demonstrated a violation under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).[255] For the reasons discussed below, the Court finds that Ortiz has failed to show that he is entitled to relief under the AEDPA.

### A. Background

The Honorable Sam Callan presided over voir dire.[256] Judge Callan reviewed a detailed questionnaire with the veniremembers.[257] When he came to the portion of the questionnaire concerning the veniremembers' attitudes towards capital punishment, Judge Callan enumerated the eight capital crimes provided for by Texas law and explained what must happen for a criminal defendant to receive the death penalty, rather than life in prison.[258] That is, if a jury finds that a defendant is guilty of capital murder, it must then answer two "special questions."[259] First, the jury must determine whether the defendant would likely commit criminal acts of violence in the future, such that he would represent a continuing threat to society.[260] Second, the jury must ascertain whether, in light of all the evidence, including the circumstances of the offense and the defendant's character, background, and personal moral culpability, there are sufficient mitigating circumstances to warrant his receiving a life sentence rather than the

253. *Ward v. Sternes*, 334 F.3d 696, 703–04 (7th Cir.2003) (internal citations and quotations omitted).

254. Pet'r's Br. 10.

255. *Ortiz v. State*, 93 S.W.3d 79, 90 (Tex. Crim.App.2002).

256. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 11 of 37, at cover.

257. *Id.*, Rep. R., Vol. 11 of 37, at 1–63.

258. *Id.*, Rep. R., Vol. 11 of 37, at 62–65.

259. *Id.*, Rep. R., Vol. 11 of 37, at 64–65.

260. *Id.*

death penalty.[261] Judge Callan informed the prospective jurors that, if the jury answered both of these questions in the affirmative, the trial judge would be required to sentence the defendant to death.[262]

> Judge Callan then advised the jury pool: I am now going to ask you some questions about your convictions regarding the death penalty. Be assured that I am not now assuming that you will find the defendant guilty of capital murder or of any other crime in this case. Nevertheless, it is necessary to learn your state of mind about capital punishment in general, to determine whether you have an open mind as regards what might be a just and proper sentence in a capital case if the defendant in that case is found guilty as charged.
>
> So I am asking about your state of mind regarding capital murder in general. I am not asking in this next question what you think would be a just penalty in this or any particular case. I'm not at this time even asking you about your opinion as regards the death penalty in a retaliation capital murder case. And I am most especially not asking what you might think would be a just verdict in this case—in this particular case. I am asking, rather, whether for religious or philosophical or any other reason you believe that the death penalty should never be inflicted in any case, regardless of what the evidence might be.
>
> In answering this next question, keep in mind that the circumstances and motives for the commission of crimes, including capital murder, are unlimited. Place a check mark by your answer, yes or no.

> Do you have conscientious scruples in regard to the infliction of death for a person convicted of capital murder? Yes or no?
>
> If you answered the preceding question yes, come up to the bench now.[263]

Doporto was one of several veniremembers who self-selected themselves as having significant enough scruples against the infliction of capital punishment that they believed it should never be imposed under any circumstances.[264] After Doporto announced her name and juror number to the Court, the following exchange ensued:

> MS. DOPORTO: Number 88, Anna Doporto. I have seen other murder cases and have agreed with the death penalty, but I don't feel I could bring a death penalty for somebody, to put that pressure on me.
>
> THE COURT: Ma'am, it's not a question right now of how you feel about your serving as a juror. Right now, are you opposed to the death penalty in all cases?
>
> MS. DOPORTO: No, sir.
>
> THE COURT: Could you ever, sitting as a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty?
>
> MS. DOPORTO: No, sir.
>
> THE COURT: Anybody want to ask a further question[?]
>
> MR. ROSALES:[265] No, Your Honor.
>
> MR. LOCKE: No.
>
> THE COURT: You may take your seat.

---

261. *Id.*

262. *Id.*, Rep. R., Vol. 11 of 37, at 65.

263. *Id.*, Rep. R., Vol. 11 of 37, at 65–66.

264. *Id.*, Rep. R., Vol. 11 of 37, at 79.

265. Joe Rosales was one of the two Assistant El Paso County Criminal District Attorneys assigned to prosecute Ortiz.

MR. ROSALES: State will challenge, Your Honor.

THE COURT: Granted.

MR. GANDARA: Defense would object to the challenge for cause.[266]

### B. Legal Standard—The Selection of Jurors in Capital Cases

The *Witherspoon* Court established the outer constitutional boundaries governing the selection of jurors in capital cases.[267] Illinois law then authorized the exclusion for cause of any potential juror who expressed opposition to capital punishment or conscientious scruples against its infliction.[268] On such statutory basis, the prosecution successfully eliminated forty-seven members of the venire in a capital case by challenging any prospective juror who expressed qualms about the death penalty.[269] The challenges were not accompanied by an inquiry to determine whether the juror could nonetheless subordinate his personal views to his duty to abide by his oath as a juror and follow the law.[270] Observing that a jury "culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—" would not be impartial, as constitutionally required, but rather would be inordinately predisposed to return a death sentence, the *Witherspoon* Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause

simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." [271]

The Court revisited its holding and crafted a distinct test in *Adams v. Texas*.[272] In that case, the petitioner challenged a provision of the Texas Penal Code which required the trial court to disqualify any prospective juror who, after being informed of the mandatory penalties under state law for a capital offense (*i.e.*, death or life in prison) was unable or unwilling to take an oath affirming that the knowledge of the prescribed penalties would not affect his deliberations on any issue of fact.[273] This oath was administered against the backdrop of Texas' bifurcated capital prosecution scheme, in which the trial is separated into guilt-innocence and punishment phases.[274] If and when the jury returns a guilty verdict after the trial on guilt-innocence, it must then answer three "special questions." [275] If the jury answers these questions in the affirmative, the trial court must sentence the defendant to death.[276]

The *Adams* Court determined that the state penal code provision at issue violated the holding of *Witherspoon* because its "touchstone of inquiry" did not turn on whether potential jurors "could and would follow their instructions and answer the posited [special] questions in the affirmative if they honestly believed the evidence warranted it beyond a reasonable

---

266. *Id.*, Rep. R., Vol. 11 of 37, at 79–80.

267. *Witherspoon v. Illinois*, 391 U.S. 510, 512, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

268. *Id.*

269. *Id.* at 514–15, 88 S.Ct. 1770.

270. *Id.* at 516 n. 7, 88 S.Ct. 1770.

271. *Id.* at 522–3, 88 S.Ct. 1770.

272. *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

273. *Id.* at 40, 100 S.Ct. 2521.

274. *Id.*

275. *Id.* at 40–41, 100 S.Ct. 2521.

276. *Id.* at 41, 100 S.Ct. 2521.

doubt."[277] Rather, it observed, the test imposed under the penal code provision impermissibly operated to exclude those prospective jurors who merely "stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally."[278]

While emphasizing that the State could have no legitimate interest in "such a broad-based rule of exclusion," the *Adams* Court nonetheless acknowledged that the states retain a valid interest in empaneling jurors who can follow the trial court's instructions and obey their oaths to impartially consider the evidence of guilt.[279] The *Adams* Court therefore approved:

> the general proposition that a juror may not be excluded for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his*

*instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.[280]

■ In *Wainwright v. Witt*, the Court further clarified that the constitutional test set forth in *Adams*, rather than in *Witherspoon*, represents the proper standard by which to judge whether a juror has been properly excluded from jury service in a capital case.[281] The *Witt* Court moreover emphasized that it is not necessary for a juror to make it "unmistakably clear" that he would automatically vote against the death penalty in order for that juror to be constitutionally excluded from service:

> The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. We note that ... this standard ... does not require

277. *Adams*, 448 U.S. at 49, 100 S.Ct. 2521.

278. *Id.* at 49, 100 S.Ct. 2521. The provision similarly excluded other prospective jurors who "were unable to positively state whether or not their deliberations would in any way be 'affected.'" *Id.* at 50, 100 S.Ct. 2521. However, the Court noted, "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Id.*

279. *Id.* at 44, 100 S.Ct. 2521.

280. *Id.* at 45, 100 S.Ct. 2521 (emphasis added).

281. *Wainwright v. Witt*, 469 U.S. 412, 425, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *see also Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (explaining that, pursuant to *Witt*, the proper

standard for determining when a juror may be excluded for cause due to his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath). "It is clear from *Witt* and *Adams*, the progeny of *Witherspoon*, that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728, 112 S.Ct. 2222. Similarly, "a juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." *Id.* at 729, 112 S.Ct. 2222.

that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.[282]

*Witt* makes abundantly clear that whether a particular member of the jury pool is or is not biased and therefore properly seated

on the jury is a question of fact based on the trial judge's on-the-spot assessment of credibility and demeanor.[283] As a determination of fact, a trial judge's finding of bias during voir dire is subject to a presumption of correctness on collateral review.[284] The petitioner bears the burden of rebutting the determinations by clear and convincing evidence to the contrary.[285]

### C. Discussion

■ Because Ortiz's claim regarding Doporto was adjudicated on the merits in state court, this Court may not grant relief unless, in determining that Judge Callan did not violate *Witt* in granting the State's challenge for cause, the Court of Criminal Appeals arrived at a decision on direct appeal that was: (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[286]

**282.** *Witt*, 469 U.S. at 419, 105 S.Ct. 844 (emphasis in original) (stressing that, in its decisions subsequent to *Witherspoon*, the Court had never required " 'ritualistic adherence' to a requirement that a juror make it unmistakably clear that he would *automatically* vote against the imposition of capital punishment.").

**283.** *Id.* at 428, 105 S.Ct. 844. Thus, even before the enactment of the AEDPA, the trial judge's findings on this issue were entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence to the contrary. *See Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir.2003), *cert. denied* 543 U.S. 842, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004) (citing 28 U.S.C. § 2254(e)(1) and *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)); *Fuller v. Johnson*, 114 F.3d 491, 500–01 (5th Cir.1997) (stating that a trial judge's finding of bias during voir dire is a determination of fact which is subject to a presumption of correctness on collateral review, whether evaluated

under the pre-AEDPA version of § 2254(d), *Witt*, or the amended provisions of the AEDPA). The high level of deference paid to a trial court's factual findings thus remains intact after the enactment of the AEDPA. *See* 28 U.S.C.A. § 2254(e)(1) (West 2005 rev.) ("In a habeas proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

**284.** 28 U.S.C.A. § 2254(e)(1); *Cardenas v. Dretke*, 405 F.3d 244, 250 (5th Cir.2005); *Fuller v. Johnson*, 114 F.3d 491, 500–501 (5th Cir.1997).

**285.** 28 U.S.C.A. § 2254(e)(1); *Cardenas*, 405 F.3d at 250; *Fuller*, 114 F.3d at 500–501.

**286.** 28 U.S.C.A. § 2254(d); *Wiggins*, 539 U.S. at 520, 123 S.Ct. 2527; *Price*, 538 U.S. at

After review, the Court finds that the Court of Criminal Appeals clearly and correctly identified *Witt* as the Supreme Court precedent governing Ortiz's claim that Doporto was improperly excluded from jury service due to her views on capital punishment. The Court also determines that the Court of Criminal Appeals did not unreasonably apply the governing precedent. The Court of Criminal Appeals found that the record before it, in its totality, was sufficient to support a finding that Doporto was unalterably opposed to the imposition of the death penalty under any circumstances, and as instructed by *Witt,* properly deferred to the fact-finder's evaluations of Doporto's credibility and demeanor. The Court further finds that Ortiz has not defeated the presumption, as it is his burden to do, that Judge Callan's factual determinations regarding Doporto's attitude towards the death penalty and its application were correct.[287] Under such circumstances, the Court the Court of Criminal Appeals' rejection of Ortiz's claim on the merits was neither contrary to, nor an unreasonable application of, clearly established federal law, as established by the Supreme Court of the United States. Similarly, the Court of Criminal Appeals' decision did not represent an unreasonable determination of the facts in light of the evidence before it. Thus, the Court cannot grant relief regarding this claim.[288]

## V. GROUND TWO: GANDARA RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PREVENT THE IMPROPER EXCLUSION OF OTHERWISE QUALIFIED PROSPECTIVE JURORS DUE TO THEIR VIEWS REGARDING CAPITAL PUNISHMENT.

In his Petition, Ortiz argues that Gandara rendered ineffective assistance because he failed to prevent the exclusion of prospective jurors Doporto, Reid, Bonilla, Ramirez, Berlit, Reta, Lopez, Herrick, Parra, Vera, Escamilla, Cortinas, Estala, Portillo, Gallegos, Palomo, Santoscoy, Ruiz, and Caballero, because these jurors merely voiced opposition to capital punishment.[289] The Court of Criminal Appeals adopted the findings of fact and conclusions of law entered by the state habeas court and rejected Ortiz's claim on the merits.[290] For the reasons set forth below, the Court finds that Ortiz has not shown that he is entitled to relief under the AEDPA.

### A. Legal Standard—Ineffective Assistance of Counsel Claims

An ineffective assistance of counsel claim has two components.[291] First, the petitioner must show that counsel performed deficiently.[292] To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."[293] The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"[294]

639–40, 123 S.Ct. 1848; *Williams,* 529 U.S. at 404–05, 120 S.Ct. 1495.

287. 28 U.S.C.A. § 2254(e)(1).

288. *See supra* note 243.

289. Pet'r's Br. 10.

290. *Ex parte Ortiz,* No. 54,488–01 (Tex.Crim. App.2003) (per curiam) (unpublished order).

291. *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527; *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

292. *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527.

293. *Id.*

294. *Id.* (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).

To establish that counsel's representation fell below an objective standard of reasonableness, a petitioner must overcome a strong presumption that his attorney's conduct fell within a wide range of reasonable professional assistance.[295] Reviewing courts are extremely deferential in scrutinizing counsel's performance, making every effort to eliminate the distorting effects of hindsight.[296] It is strongly presumed that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions.[297] An attorney's strategic choices, usually based on information supplied by the defendant and from a thorough investigation of relevant facts and law, are virtually unchallengeable.[298] Counsel is neither required to advance every non-frivolous argument, nor to investigate every conceivable matter, nor to assert patently frivolous arguments.[299] Defense counsel is similarly not required to exercise clairvoyance during the course of a criminal trial.[300]

█ Furthermore, even if counsel's performance falls below an objective standard of reasonableness, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[301] Accordingly,

295. *Strickland*, 466 U.S. at 687–91, 104 S.Ct. 2052.

296. *See, e.g., Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (explaining the compelling policy considerations behind *Strickland's* contemporary, rather than retrospective, assessment of counsel's conduct); *Burger v. Kemp*, 483 U.S. 776, 789, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (stating that a fair assessment of attorney performance requires the court to make every effort to eliminate the distorting effect of hindsight and to evaluate counsel's decisions based on the then-existing circumstances and counsel's perspective at the time); *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir.1997) (stating that the court will not find inadequate representation merely because, with the benefit of hindsight, it disagrees with counsel's strategic choices).

297. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992); *Duff–Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir.1992).

298. *See Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir.1996) (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel feared that the jury would not view such testimony as mitigating and that the prosecution might respond to such testimony by presenting its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson*, 92 F.3d 1385, 1406–09 (5th Cir.1996) (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews with the defendant and the defendant's family failed to produce any helpful information); *cf. Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527 (holding that, in a capital case, counsel's decision not to expand its mitigation-defense investigation beyond reviewing a presentence investigation report and Department of Social Services records, despite suggestions that additional, significant mitigating evidence existed, was unreasonable and fell below professional standards).

299. *See Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995) (stating that counsel cannot be held deficient for failing to press a frivolous point); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir.1995) (stating that the Sixth Amendment does not require counsel to file meritless motions); *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992) (noting that the defense of a criminal case is not an undertaking in which everything not prohibited is required, nor does it contemplate the employment of wholly unlimited time and resources).

300. *See Sharp v. Johnson*, 107 F.3d 282, 290 n. 28 (5th Cir.1997) (holding that clairvoyance is not a required attribute of effective representation).

301. *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052.

"any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." [302]

Because a convicted defendant must satisfy both prongs of the *Strickland* test, his failure to establish either deficient performance or prejudice under that standard makes it unnecessary for a court to examine whether the petitioner has satisfied the other prong.[303] Therefore, a convicted defendant's failure to establish that his counsel's performance fell below an objective standard of reasonableness avoids the need to consider the issue of prejudice.[304] Similarly, it is also unnecessary to consider whether counsel's performance was deficient where there is an insufficient showing of prejudice.[305] Moreover, mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue.[306]

## B. The State Habeas Court's Findings of Fact and Conclusions of Law

The state habeas court entered factual findings regarding each of the prospective jurors in question. Concerning prospective juror Reid, the state habeas court found that he expressed conscientious scruples against the death penalty during his individual voir dire.[307] As to Bonilla, it determined that she exhibited "an inability to impose the death penalty under any circumstance because 'only God has a right to take away someone's life.'"[308] The state habeas court found that Ramirez displayed "an inability to impose the death penalty under any circumstance because of her strongly-held religious beliefs."[309] Prospective juror Berlit, the state habeas court concluded, expressed "an inability to impose the death penalty under any circumstance because he felt the death penalty '[was] unjustified in all cases.'"[310] Reta, it determined, exhibited "an inability to impose the death penalty under any circumstances" because, like Berlit, she stated that she was "'opposed to the death penalty in all cases.'"[311] The state habe-

302. *Id.* at 692, 104 S.Ct. 2052.

303. *Id.* at 700, 104 S.Ct. 2052; *Green*, 116 F.3d at 1122; *see also Burnett v. Collins*, 982 F.2d 922, 928 (5th Cir.1993) (stating that the defendant bears the burden of proof on both prongs of the *Strickland* test).

304. *Hoskins*, 910 F.2d at 311; *Thomas*, 812 F.2d at 229–30.

305. *See Strickland*, 466 U.S. at 699, 104 S.Ct. 2052 (explaining that it is not necessary for a court evaluating the merits of an ineffective assistance claim to analyze the components of the applicable test in any particular order or to evaluate both components if the petitioner fails to carry his burden as to one aspect of the test); *Black v. Collins*, 962 F.2d 394, 401 (5th Cir.1992) (stating that a court evaluating a claim of ineffective assistance need not address the components of the applicable test in order, and if a defendant fails to carry his burden as to one component of the test, the

court need not address the other component); *Pierce*, 959 F.2d at 1302 (asserting that an insufficient showing of prejudice pretermits addressing the adequacy prong of the *Strickland* test for ineffective assistance).

306. *See Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir.1994) (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief).

307. *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 40.

308. *Id.* at ¶ 43.

309. *Id.* at ¶ 46.

310. *Id.* at ¶ 49.

311. *Id.* at ¶ 52.

as court found that Lopez showed an "inability to impose the death penalty under any circumstances because of her expressed belief that "only God gives life, and only God takes away life." "[312] The state habeas court determined that Herrick expressed "an inability to impose the death penalty under any circumstances based upon his convictions as a Quaker."[313] Parra, it concluded, stated an "inability to impose the death penalty under any circumstance 'in any case whatsoever.' "[314] The state habeas court found that prospective juror Vera similarly expressed "an inability to impose the death penalty under any circumstance."[315] Escamilla, it determined, stated that he was unable "to impose the death penalty under any circumstance and in any case."[316] The state habeas court found that Cortinas, too, expressed an "inability to impose the death penalty under any circumstance."[317] Estala, it decided, displayed an "inability to impose the death penalty under any circumstance because he felt the death penalty was 'never justified.' "[318] The state habeas court concluded that prospective juror Portillo exhibited an "inability to impose the death penalty under any circumstance because 'two wrongs don't make a right.' "[319] Gallegos, it determined, expressed an "inability to impose the death penalty under any circumstance

due to her strongly-held beliefs as a 'practicing Catholic.' "[320] The state habeas court similarly determined that Paloma voiced "an inability to impose the death penalty under any circumstance because of her religious beliefs."[321] Santoscoy, it concluded, demonstrated an "inability to impose the death penalty under any circumstance or any set of facts."[322] Ruiz, it found, displayed an "inability to impose the death penalty under any circumstance because of his 'religious convictions.' "[323] Caballero exhibited an "inability to impose the death penalty under any circumstance because of her strong personal opposition to the death penalty."[324] Lastly, as to Doporto, the state habeas court found that she expressed "her inability to impose the death penalty under any circumstances."[325] Regarding each of these prospective jurors, the state habeas court determined that the individual's opposition to the death penalty would have materially and substantially impaired his or her ability to fairly and honestly answer the death-penalty special issues based upon the evidence presented.[326]

## C. Discussion

■ As noted above, the state habeas court's factual determinations enjoy a pre-

---

312. *Id.* at ¶ 55.

313. *Id.* at ¶ 58.

314. *Id.* at ¶ 61.

315. *Id.* at ¶ 64.

316. *Id.* at ¶ 67.

317. *Id.* at ¶ 70.

318. *Id.* at ¶ 73.

319. *Id.* at ¶ 76.

320. *Id.* at ¶ 79.

321. *Id.* at ¶ 82.

322. *Id.* at ¶ 85.

323. *Id.* at ¶ 88.

324. *Id.* at ¶ 94.

325. *Id.* at ¶ 91.

326. *Id.* at ¶ 41 (Reid), ¶ 44 (Bonilla), ¶ 47 (Ramirez), ¶ 50 (Berlit), ¶ 53 (Reta), ¶ 56 (Lopez), ¶ 59 (Herrick), ¶ 62 (Parra), ¶ 65 (Vera), ¶ 68 (Escamilla), ¶ 71 (Cortinas), ¶ 74 (Estala), ¶ 77 (Portillo), ¶ 80 (Gallegos), ¶ 83 (Palomo), ¶ 86 (Santoscoy), ¶ 89 (Ruiz), ¶ 92 (Doporto).

sumption of correctness under 28 U.S.C. § 2254(e)(1), absent the petitioner's presentation of clear and convincing evidence to the contrary.[327] "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state's conclusions of mixed law and fact."[328] This Court's initial inquiry under 28 U.S.C. § 2254(e)(1), therefore, is solely whether Ortiz has shown by clear and convincing evidence that the state habeas court's factual determination, that the prospective jurors at issue were unalterably opposed to capital punishment and unable to vote to impose the death penalty under any circumstances, was incorrect. After careful consideration, the Court concludes that Ortiz has not carried his burden.

The record, on its face, supports the state habeas court's factual findings. Each of the veniremembers at issue clearly expressed significant misgivings about the death penalty and doubt regarding his or her ability to overcome personal feelings and follow the law. Ortiz has failed to present any evidence, much less evidence of a clear and convincing nature, to rebut the presumptive correctness of the state habeas court's factual determinations. Consequently, this Court must presume that the state habeas court correctly determined that the jurors in question were unalterably opposed to the death penalty and unable to impose it under any circumstances.[329]

The Court has applied the *Strickland* standard to the state habeas court's factual findings, and concludes that Ortiz has not shown that he is entitled to relief under the AEDPA. Because the prospective jurors at issue each expressed a deep-seated opposition to the death penalty which would have materially and substantially impaired his or her ability to fairly and honestly answer the death-penalty special issues based upon the evidence presented, the trial court did not violate *Witt* by granting the State's challenge for cause. Absent a violation of *Witt*, Gandara did not perform deficiently under *Strickland* by failing to object to the veniremembers' dismissal for cause.[330] Ortiz additionally

---

**327.** The Court observes that Judge Guaderrama presided over the guilt-innocence and punishment phases of Ortiz's trial and Ortiz's state habeas proceeding, while Judge Callan presided at voir dire. The Court further notes that Judge Guaderrama held only a "paper" hearing on Ortiz's state application for habeas corpus relief, in lieu of a full evidentiary hearing. However, these facts have little, if any, impact on the degree of deference this Court must afford the Judge Guaderrama's factual findings, even as to Grounds One and Two of Ortiz's Petition, which arise from events at voir dire. *See Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir.2001) ("[A] full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.") "The AEDPA requires that we presume correct the habeas court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.' This is so even if the hearing was a 'paper'

hearing and may not have been full and fair." *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir.2004) (internal citations and quotations omitted). While this Court does not find any deficiency in the paper hearing held by Judge Guaderrama, even if it did, the deference the Court owes to the state habeas court's factual findings does not depend on the quality of the state court's evidentiary hearing. *Id.; but see Rudd*, 256 F.3d at 319 (suggesting, in a post-AEDPA, but pre-*Valdez*, decision, that federal courts should afford even stronger deference to a paper hearing where the trial judge and the state habeas judge are the same).

**328.** *Valdez*, 274 F.3d at 948 n. 11.

**329.** *See supra* note 252.

**330.** *Ex parte Ortiz.* No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. Of Fact & Concl. Of Law, at ¶¶ 130–31 (noting that Ortiz had failed to show prejudice from his counsel's failure to object, as an objection would not

failed to demonstrate prejudice under *Strickland*, because he did not present the state habeas court with any facts to show that Gandara could have prevented the potential jurors' exclusion or that Gandara could have somehow made these individuals retreat from their opposition to capital punishment.[331] Failure to meet either aspect of *Strickland's* two-pronged test proves fatal to Ortiz's claim. The Court accordingly finds that the Court of Criminal Appeals' rejection of Ortiz's claim on the merits was neither contrary to, nor an unreasonable application of, clearly established federal law, as established by the Supreme Court of the United States, nor did the Court of Criminal Appeals' decision represent an unreasonable determination of the facts in light of the evidence before it.[332]

## VI. GROUND THREE: GANDARA RENDERED INEFFECTIVE ASSISTANCE AT THE PUNISHMENT PHASE OF THE TRIAL BECAUSE HE FAILED TO ADEQUATELY INVESTIGATE AND DID NOT PRESENT ANY EVIDENCE IN MITIGATION OF PUNISHMENT.

### A. The Parties' Arguments

 Ortiz contends that Gandara was ineffective at the punishment phase because he did not call Ortiz's wife and parents to testify.[333] Ortiz's argument has two components. First, Ortiz asserts that his relatives' proposed testimony, which is summarized in three affidavits appended to Ortiz's state application for habeas corpus relief, represents mitigating evidence.[334] Second, Ortiz alleges that Gandara did not present the evidence to the jury because, due to inadequate investigation, he did not know that the evidence existed.[335] Under *Strickland*, as extended in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), Ortiz asserts, Gandara was therefore constitutionally ineffective in his representation.[336]

Further, Ortiz argues, the state habeas court applied an erroneous legal standard when it determined that Ortiz had not demonstrated prejudice under *Strickland*.[337] In support of his argument, Ortiz notes that, in paragraph 116 of its findings of fact and conclusions of law, the state habeas court reasoned that Ortiz had not met the prejudice prong of *Strickland* because he failed to show that, if the testimony of his family members had been presented at trial, the testimony would "have *necessarily* resulted in a life sentence rather than a death sentence."[338] The *Strickland* test for prejudice, Ortiz argues, requires that relief be granted if counsel's unprofessional performance produces "any *reasonable probability* of a different outcome."[339] By requiring that Ortiz show that a different outcome would have been "absolutely certain" if Gandara had presented the testimony at issue, says Ortiz, the state habeas court unreasonably applied clearly established Supreme Court jurisprudence.[340]

---

have required the trial court to change its proper ruling).

331. *Id.* at ¶ 141.

332. *See supra* note 243.

333. Pet'r's Br. 43.

334. *Id.* at 49.

335. *Id.* at 50–51.

336. *Id.*

337. *Id.*

338. Pet'r's Br. 49–50; *see Ex parte Ortiz*, No. 54,488-01 (Tex.Crim.App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 116.

339. Pet'r's Brief 50–51.

340. *Id.* at 50.

Respondent concedes that Ortiz correctly states *Wiggins'* core proposition.[341] That is, Respondent agrees that Gandara may not invoke trial strategy to shield himself from Ortiz's claim that he was ineffective for failing to investigate altogether or for prematurely terminating an investigation to uncover potentially mitigating evidence, if Gandara's decision not to investigate or to terminate the investigation was itself unreasonable.[342] However, Respondent counters, Ortiz has not shown that Gandara was unaware of the testimony Ortiz's wife and parents could have offered, and therefore has failed to establish a claim under *Wiggins*.[343]

Respondent further avers that Ortiz has not demonstrated Gandara's strategic decision not to introduce the evidence in question was professionally unreasonable, in light of the evidence's questionable value.[344] Respondent notes that, unlike the heartrending evidence of childhood abuse and deprivation that could have been discovered and offered in the *Wiggins* case, the testimony that would have been offered by Ortiz's family members would not have shown that Ortiz was clearly less morally blameworthy and thus less deserving of the death penalty for his conduct.[345] Given Ortiz's considerable criminal history, both charged and uncharged, Respondent concludes that the testimony would also have been subject to damaging impeachment by the prosecution.[346]

Respondent additionally asserts that Ortiz has put undue emphasis on paragraph 116 of the state habeas court's findings of fact and conclusions of law, ignoring that the state habeas court correctly stated the applicable legal standard in the next paragraph and concluded that Ortiz did not demonstrate "a reasonable probability" that, but for Gandara's alleged deficiencies, Ortiz would have received a life sentence.[347] Lastly, Respondent argues, assuming for the sake of argument that the state habeas court did misstate or even misapply the governing federal precedent, Ortiz is still not entitled to relief because he must do more than merely allege prejudice; he must affirmatively prove it.[348] Respondent contends that Ortiz has not done so.[349]

## B. The Record

As set forth in Section I.C, *supra*, of this Opinion, the record shows that, at the close of the State's case in the trial's punishment phase, Gandara requested a short recess to confer with his client.[350] When the proceeding reconvened, Gandara told the Court that the defense would rest.[351] The following day, outside the presence of the jury and before charging it, the trial court addressed Ortiz and inquired whether it had been his decision not to testify at the guilt-innocence or punishment phases of the trial.[352] Ortiz replied that it was his decision not to testify.[353] The trial court

341. Resp't's Answer 29.

342. *Id.*

343. *Id.* at 29–30.

344. *Id.*

345. *Id.* at 29.

346. *Id.*

347. *Id.* at 31.

348. *Id.*

349. *Id.*

350. *State v. Ortiz*, Tr. Ct. No. 980D08993, Rep. R., Vol. 34 of 37, at 138.

351. *Id.*

352. *Id.*, Rep. R., Vol. 35 of 37, at 7–8.

353. *Id.*, Rep. R., Vol. 35 of 37, at 8.

additionally questioned Gandara, asking him whether the decision not to call witnesses at the punishment phase involved trial strategy.[354] Gandara stated that the decision rested in part on trial tactics and in part on Ortiz's wishes.[355] Ortiz confirmed Gandara's representations to the Court.[356]

### C. The Affidavits Offered By Ortiz in the State Habeas Proceeding

Ortiz submitted three affidavits with his state application for habeas corpus relief. Because the affidavits are relatively short and relevant to the Court's disposition of Ortiz's claim, it will set them out verbatim before proceeding further.

Linda Ortiz submitted the following signed but unsworn declaration, dated September 23, 1998:

Dear Mr. De Koatz,[357]

My name is Linda Ortiz and I am the wife of Ricardo Ortiz. We will be celebrating our second year of marriage on October 15th. I met Ricardo back in 1990[;] at this time I was expecting my third child Justin. I was about three months pregnant. Ricardo didn't let it bother him that he wasn't my childrens['] father. He treated my daughter as if she was his own flesh and blood. Brittany started calling him daddy and Ricardo asked if that was okay with me, long as you feel comfortable with it. When my son Justin was born in May Ricardo asked if he could be named as the father on the birth certificate even though he's not the real father. He told me that just because he didn't make the child does[n]'t make him less of a father

because there are plenty of men whom are fathers and they didn't have any part of the creation. I told him I felt flattered but I am still married to my son's father even though I had already filed for a divorce. Ricardo has always been a loving father and devoted husband. He's always made time during the day to spend quality time with the children and always have a family outing on the weekends. He was a dotting [sic] father at Brittany's graduation from headstart. He want [sic] everyone to know that she is his daughter and afterwards he had her [sic] the biggest party ever. Brittany was tickled pink. I am very much in love with my husband and I know in my heart of hearts that Ricardo could never have done the terrible things he's accused of. Ricardo is a very kind and gentelman [sic] and I emphasize a gentelman [sic].[358]

Ramon Ortiz purportedly submitted the following unsworn, unsigned, and undated declaration:

I, Ramon Ortiz[,] am the father of Ricardo Ortiz. I raised my son to be a good citizen. What can I tell you about my son, he is the baby of the family. Ricardo is not only my son, he is my friend. I enjoyed going to see him play, not only him, but all of my friends[.] One day he told me he wanted to be a priest. I took him to St. Charles Seminar [sic]. Where he spend a few days there. As he grew up I can't explain what happen after that. Maybe prison life changed him. The first time he went to prison I felt like I had failed him. He gets along

---

354. *Id.*

355. *Id.*

356. *Id.*

357. Attorney Matthew DeKoatz represented Ortiz in his state habeas proceedings.

358. *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Pet'r's App. for Post–Conviction Writ of Habeas Corpus, App. 5.

with all of the family.[359]

Beatrice Ortiz allegedly submitted the following unsworn, unsigned, and undated declaration:

I, Beatrice Ortiz, the mother of Ricardo Ortiz, raised my son here in Fabens, Texas. He lived with me and my husband, Ramon Ortiz[,] and our other four children. He was born in El Paso, Texas. Ricardo was a very active young man, when he was growing up, he played many sports in high school such as football, basketball. He graduated from Fabens High School, in 1980. He went to church every Sunday with us and he was also an alter [sic] boy at the Church of Our Lady of Guadalupe in Fabens, Texas. He never talked back to me, or bad mouth me, we argue like any other parent and child but that is normal. But in the end he always had respect for me and my husband. He was very well liked by all his friends and family.[360]

### D. The State Habeas Court's Findings of Fact and Conclusions of Law

The state habeas court entered the following factual findings regarding Ortiz's claim. At the punishment phase of the trial, Gandara presented no evidence.[361] Gandara had witnesses available and ready to testify at the punishment phase, but after consulting with Ortiz, decided not to call them.[362] Gandara explained that his decision not to present punishment phase evidence was a strategic one.[363] Ortiz verbally expressed his agreement with Gandara's decision not to present any punishment-phase evidence, stated that he made the decision not to testify at trial, and also stated that he was satisfied with Gandara's performance.[364] Regarding the affidavits from Ortiz's family members, the state habeas court found that the affiants expressed love for Ortiz.[365] However, nothing in the affidavits affirmatively showed that these individuals' testimony would have made any difference in the outcome of the punishment phase.[366] Applying its factual findings to the applicable legal test set forth in *Strickland,* the state habeas court concluded that Ortiz had failed to establish a claim of ineffective assistance.[367] The Court of Criminal Appeals adopted the findings of fact and conclusions of law entered by the state habeas court and rejected Ortiz's claim on the merits.

### E. Discussion

As a preliminary matter, the Court must determine whether Ortiz has shown by clear and convincing evidence that the state habeas court's factual determinations regarding this claim were incorrect.[368] After independently reviewing the record and the Parties' pleadings, the Court concludes that Ortiz has not met his burden. The record in this cause fully supports the state habeas court's factual determinations, including its finding that Gandara had witnesses available and ready to testify at the punishment phase and that the

---

**359.** *Id.*

**360.** *Id.*

**361.** *Ex parte Ortiz,* No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 8.

**362.** *Id.* at ¶ 9.

**363.** *Id.* at ¶ 10.

**364.** *Id.* at ¶¶ 11–12.

**365.** *Id.*

**366.** *Id.* at ¶ 13.

**367.** *Id.* at ¶ 117.

**368.** 28 U.S.C.A. § 2254(e)(1).

information contained in the affidavits submitted by Ortiz's family members would not have influenced the outcome of the punishment phase if Gandara had called those individuals to testify. Given the extensive and extremely damaging evidence produced by the State at the punishment phase regarding Ortiz's violent past—in addition to the evidence already adduced at the guilt-innocence stage—the testimony of Ortiz's family members would likely have come across to the jury as either painfully naive or self-deluding, if not deliberately disingenuous. The State would have easily been able to drive this impression home to the jury on cross-examination and, in the process, even further emphasize Ortiz's capacity for violence and lawlessness that it had already portrayed in its punishment case-in-chief.

Because Ortiz has not shown by clear and convincing evidence that the state habeas tribunal's factual determinations were incorrect, the Court must presume that those factual findings were correct and evaluate that forum's legal decision accordingly. After review, the Court finds that those factual findings lead to the inevitable conclusion that Ortiz failed to establish a viable ineffective-assistance claim under *Strickland.*

First, Ortiz did not demonstrate that Gandara was unaware of the testimony that could have been offered by Ortiz's family members, which effectively precludes relief on a claim alleging the type of deficient performance at issue in *Wiggins.*[369] Additionally, Ortiz did not show that the affiants' testimony would have been particularly probative of mitigating circumstances, and thus failed to demonstrate prejudice flowing from Gandara's alleged shortcomings. Further, Ortiz has not overcome the strong presumption under *Strickland* that Gandara's decision not to call the affiants as witnesses was professionally reasonable, given the fact that their testimony would have provided the State with further opportunities to emphasize Ortiz's longstanding history of violence and criminality. Moreover, Ortiz represented to the trial court that he did not want the witnesses to testify.[370] Lastly, Ortiz has failed to come forward with any other witnesses that Gandara could have called to testify in mitigation or to explain how their testimony would have been reasonably likely to alter the outcome of the punishment phase.

In light of Ortiz's inability to show either deficient performance or prejudice, both of which he must establish in order to prevail on his claim of constitutionally ineffective assistance of counsel, the state courts' rejection of Ortiz's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as established by the Supreme Court of the United States, nor did the decision result from an unreasonable determination of the facts in light of the evidence before it.[371]

---

**369.** *Wiggins v. Smith,* 539 U.S. 510, 516–517, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (concluding that the defense team's decision: (1) not to expand its investigation beyond a presentence investigation report and department of social services records detailing the defendant's problems in foster care and his mother's alcoholism; and (2) not to commission a social history report by a forensic social worker, which would have revealed that the defendant suffered significant physical and sexual abuse as a child, stemmed from inattention rather than strategic judgment).

**370.** While the record is silent as to the exact nature of Ortiz's hesitancy, it appears that Ortiz wished to spare his family members the rigors of testifying, when their testimony would have provided little in the way of mitigating evidence and would have exposed his relatives to extremely damaging and unpleasant cross-examination.

**371.** The Court finds that Respondent is correct that, although the state habeas court appears to have misstated the applicable legal test for prejudice in paragraph 116 of its

## VII. Ground Four: The State Failed to Disclose Evidence Suggesting that Hector Hernandez Testified Against Ortiz in Return for Lenient Treatment in a Collateral Criminal Matter.

In his Petition, Ortiz also contends that witness Hector Hernandez had a clandestine arrangement with the prosecution in Ortiz's case, whereby, in return for Hernandez's testimony against Ortiz, the State of Texas would treat Hernandez leniently in an ancillary criminal matter.[372] Ortiz further alleges that the purported deal between the prosecution and Hernandez was not revealed to Ortiz's defense team, in violation of the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[373] On direct appeal, the Court of Criminal Appeals determined that Ortiz had not established a *Brady* violation.[374] Ortiz renewed his *Brady* claim in his state habeas application, but the state habeas court similarly rejected his argument on the merits.[375] For the reasons discussed below, the Court finds that Ortiz has not shown that he is entitled to relief under the AEDPA.

### A. Hector Hernandez's Trial Testimony Regarding a Purported Deal with Prosecutors in Exchange for His Testifying Against Ortiz

Ortiz's claim arises from an exchange, on cross-examination, between Hector Hernandez and defense counsel Jaime Gandara. Because the Court finds that Ortiz's claim is best evaluated in context, it sets forth the relevant portion of the record in full:

MR. GANDARA: Before you were arrested in August of 1997, before you were placed in tank 430—

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: —you were outside in the free world, right?

MR. HERNANDEZ: Yes.

MR. GANDARA: And Jerry Garcia was outside in the free world, right?

MR. HERNANDEZ: Yes, he was.

MR. GANDARA: And you got arrested and put in the tank and charged with possession of heroin, right?

MR. HERNANDEZ: Yes.

MR. GANDARA: And this is while you were on probation, right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: And after you'd already been back from boot camp, correct?

MR. HERNANDEZ: Yes, sir.

---

findings of fact and conclusions of law, it nonetheless correctly states the standard in the next paragraph. Additionally, Ortiz has not shown that the state habeas court unreasonably applied the correct standard. Lastly, under the AEDPA, it is not the function of a federal district sitting in review of a state court judgment to critique the route by which a state court arrived at its ultimate result on a question of federal constitutional law. *Mitchell*, 540 U.S. at 16, 124 S.Ct. 7; *Pondexter*, 346 F.3d at 148; *Neal*, 286 F.3d at 246. Rather, the Court's task is to determine whether the state court's ultimate legal determination was reasonable under the legal prin-

ciples then-established by the Supreme Court. *Mitchell*, 540 U.S. at 16, 124 S.Ct. 7; *Pondexter*, 346 F.3d at 148; *Neal*, 286 F.3d at 246.

**372.** Pet'r's Br. 52.

**373.** *Id.*

**374.** *Ortiz. v. State*, 93 S.W.3d 79, 93 (Tex. Crim.App.2002).

**375.** *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶¶ 17–21.

MR. GANDARA: And those charges, you've pleaded guilty or they're still pending?

MR. HERNANDEZ: I did not plead guilty. They're not pending.

MR. GANDARA: They've been dismissed, haven't they?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: They've been dismissed in exchange for your testifying here?

MR. HERNANDEZ: No, sir.

MR. GANDARA: They dropped them just because? They dropped them just because? Is that what you're going to tell this jury?

MR. LOCKE: I'm going to object. This is speculation.

MR. GANDARA: They dropped them just because?

THE COURT: I'm going to overrule. I think he's entitled to speculate at this point.

MR. HERNANDEZ: I couldn't afford to go to prison.

MR. GANDARA: They dropped them because you made a deal to testify because you didn't want to go to prison, right? Right?

MR. HERNANDEZ: I was not made a deal, sir.

MR. GANDARA: They dropped the charges, didn't they?

MR. HERNANDEZ: Yes, they did.

MR. GANDARA: And they told you they were going to do it, didn't they?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: So that you could come to court to testify, right? Right? Tell us. Right? All you've got to do is say it. You swore to tell the truth a minute ago. Just say it. Say it for us.

MR. HERNANDEZ: I was not made a deal.

MR. GANDARA: You were not made a deal? They dropped the charges?

MR. HERNANDEZ: Yes, they did drop the charges.

MR. GANDARA: And you were told to say in court that you didn't have a deal, weren't you? You were told to come to court and to say, I don't have a deal. They told you that, didn't they? Didn't they?

MR. HERNANDEZ: No, sir.

MR. GANDARA: Do you remember telling your lawyer over the phone, the lawyer that you consulted with—

MR. HERNANDEZ: Yes.

MR. GANDARA: —named Donna Snyder—

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: —that you had received instructions that if you were to testify you were not to disclose that you had a deal. Do you remember telling her that?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: Okay. And you were talking to her on the phone because you were consulting with her about what you needed to do, right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: And she told you it would be wrong for you to come to court and lie about having a deal, right? Didn't she?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: You did it anyhow, didn't you. You came and lied to this jury about having cut a deal to come and tell this story about Ortiz. You lied anyhow, right? Right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: And you lied because it was part of your deal to lie, wasn't it? Wasn't it?

MR. HERNANDEZ: They never told me to lie. They always told me to tell the truth.

MR. GANDARA: And they told you not to say you had a deal, and that's a lie, isn't it?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: Pass the witness.[376]

Prosecutor Rick Locke's re-direct examination of Hernandez followed:

MR. LOCKE: Do you know when you write disclosure letters about everything that was said to you?

MR. GANDARA: Objection. Relevance.

MR. LOCKE: Okay. The relevance is— we'll show the disclosure letter about what he's saying. If we can just have a—

THE COURT: Yes. Yes, sir.

MR. LOCKE: Let the record reflect I'm showing counsel for the defense what I've previously marked as State's 17, which was faxed to him and been on file since the 22nd. Approach the witness, Your Honor.

MR. GANDARA: Objection. The witness was not privy to this letter. It was addressed to me, from the State to me. And I don't know what it is Mr. Locke's going to try to get the witness to say about the letter. The witness is not a party to this letter.

MR. LOCKE: This is a disclosure letter, Your Honor.

THE COURT: I'm wondering with Mr. Gandara how you're going to use that through this witness.

MR. LOCKE: Well—

THE COURT: I'm not saying it's not necessarily admissible, but it may not be through this witness.

MR. LOCKE: He has, apparently, made a claim that we have told him not to disclose any agreement, and now I have a document which I sent and has been on file in this case which discloses any and all agreements. So at least I'm going to ask him is this the agreement of which he speaks.

THE COURT: You're going to ask this person if the agreement in that document is the agreement he made?

MR. LOCKE: Is that whatever he's talking about where he says he made a deal with the State.

THE COURT: Okay. I'll let you—I'll let you show him that to see if it refreshes his memory or if that embodies the agreement as it was made, between you and Mr. Gandara, I guess or whoever it was made. I don't know. We just can't get into the tenure of the letter through this witness.

MR. LOCKE: Okay. Well, it's in the Court's records on file in this case.

THE COURT: But to get it in front of the jury, it's got to be admitted as an exhibit, and maybe Mr. Gandara doesn't have an objection to it.

MR. GANDARA: Well, Your Honor, this witness has testified that he was asked not to disclose that he had a deal. He's testified that a possession of heroin charge went away.

THE COURT: Do you have any objections to this letter, this document?

376. *State v. Ortiz,* Trial Ct. No. 980D08993, Rep. R., Vol. 32 of 37, at 144–48 (test. of Hector Hernandez).

He wants to introduce this document to prove—

MR. GANDARA: Yes, Your Honor, because it says that there are no deals, and that's not true. This witness has just told us that there are. And the letter says there are no written or unwritten deals for the testimony of Hernandez, and he has just told this jury, yeah, there was a deal; I got my—my possession of heroin charge dismissed, and they didn't arrest me. And what's more, they told me not to say so.

THE COURT: And he said there were no deals.

MR. GANDARA: This witness—

THE COURT: Said there were no deals.

MR. GANDARA: No, said there was a deal.

THE COURT: Well, I didn't hear that part. I heard him say that there were no deals. I know you made it seem like there might have been a deal, and maybe there was a deal, but he said—the words out of his mouth were there was no deal.

MR. GANDARA: I think if we read back the testimony—

MR. LOCKE: I object to this speaking objection. Can I ask this witness if this is the embodiment of what he's talking about, at least for clarification purposes?

THE COURT: Sure.

MR. LOCKE: If you'll look at what I've marked as State's 17—take your time. Read that instrument, understanding that instrument was sent to Mr. Gandara. That instrument has been on file in this case. That instrument has been on file in this case in the public records of this case.

MR. GANDARA: Objection. Relevance, and preface to this witness is irrelevant to anything that can be elicited from this witness. If he wants to get it in some other way, it's okay.

THE COURT: Well, I'm going to overrule that objection. I'll let him read the document. Then Mr. Locke can ask his question.

MR. LOCKE: Okay. Have you had a chance to read that document?

MR. HERNANDEZ: Excuse me?

MR. LOCKE: Have you had a chance to read that?

MR. HERNANDEZ: Yes. I just read it.

MR. LOCKE: Did you understand everything that's in there?

MR. HERNANDEZ: Yes, sir.

MR. LOCKE: You had a motion to revoke that was cause—

MR. GANDARA: Objection. Leading.

THE COURT: Sustained.

MR. LOCKE: Thank you. Did you have a motion to revoke which was cause number 73464?

MR. HERNANDEZ: Yes, I did.

MR. LOCKE: Okay. As a potential witness against a TS high-ranking member, could you afford to be incarcerated?

MR. HERNANDEZ: No, I couldn't.

MR. LOCKE: What would happen to you if you were incarcerated?

MR. HERNANDEZ: I would get killed.

MR. LOCKE: Did you tell the District Attorney's Office, indeed, that thing?

MR. HERNANDEZ: Yes, I did.

MR. LOCKE: Did we agree that you would not be arrested on that warrant?

MR. HERNANDEZ: Yes.

MR. LOCKE: Okay. Did anybody say you had to testify, you had to testify in any way, or you had to testify at all for us for doing that thing?

MR. HERNANDEZ: No.

MR. LOCKE: No one ever told you anything like that, did they?

MR. HERNANDEZ: No.

MR. LOCKE: All right. But still, we did that thing, didn't we?

MR. HERNANDEZ: Yes.

MR. LOCKE: Okay. Now, you had a particular place—or rather, you did not want to be here in El Paso to serve any portion of the revocation; isn't that correct?

MR. HERNANDEZ: That's correct, sir.

MR. LOCKE: Okay. And we said okay; is that correct?

MR. HERNANDEZ: Yes.

MR. LOCKE: Did we say you had to testify in any particular way or—

MR. HERNANDEZ: No, sir.

MR. LOCKE: testify at all for that thing?

MR. HERNANDEZ: No, sir.

MR. LOCKE: Is there anything that we said to you that said you must testify or—

MR. HERNANDEZ: No, sir.

MR. LOCKE: you must testify in any particular way for anything?

MR. HERNANDEZ: No, sir.

MR. LOCKE: Now, you were talking about an incident where you were arrested for drugs that put you in the cell with Serrucho in August; is that correct?

MR. HERNANDEZ: That's correct.

MR. LOCKE: Where did you get the drugs?

MR. HERNANDEZ: I got it from a lady named Alice Velasquez.

MR. LOCKE: What were you going to do with those drugs?

MR. HERNANDEZ: I was going to smuggle them into the jail for Mr. Ortiz.

MR. LOCKE: How do you know they were for Mr. Ortiz?

MR. HERNANDEZ: Because he called me at Alice Velasquez's house and told me to do that.

MR. LOCKE: Tell this jury where you had the drugs that you were smuggling in to Mr. Ortiz?

MR. HERNANDEZ: I had them in my rectum.

MR. LOCKE: Did you successfully get them into the jail for Mr. Ortiz?

MR. HERNANDEZ: No, I didn't.

MR. LOCKE: What happened?

MR. HERNANDEZ: I took them out, and I got arrested.

MR. LOCKE: And that's this possession of—

MR. HERNANDEZ: Yes, it is.

MR. LOCKE: Okay. When you got arrested for that, did you know Mr. Rosales?

MR. HERNANDEZ: No, I did not.

MR. LOCKE: Did you know me?

MR. HERNANDEZ: No, I did not.

MR. LOCKE: Whatever happened with that charge, did Mr. Rosales do anything with that charge?

MR. HERNANDEZ: No, he did not.

MR. LOCKE: Did I have anything to do with that charge?

MR. HERNANDEZ: No, you did not.

MR. LOCKE: Let me ask you honestly. Do you know whatever happened to that charge?

MR. HERNANDEZ: Honestly, I don't know.

MR. LOCKE: Then why are you sitting here telling him that somebody made a deal? Are you that scared?

MR. HERNANDEZ: Yes, I am.

MR. LOCKE: Then tell them that, that you're that scared.

MR. HERNANDEZ: I'm frightened.[377]

Locke indicated that he had no further questions of Hernandez and successfully moved to introduce the disclosure letter into evidence.[378]

On recross-examination, Gandara renewed his attempts to impeach Hernandez:

MR. GANDARA: And there was a motion to revoke your probation that was dismissed, right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: Correct?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: Okay. And you're going to be taken care of, as far as your probation is concerned, after this trial is over, right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: And they're not going to revoke you, right?

MR. HERNANDEZ: No, sir.

MR. GANDARA: They're just going to put you on straight probation, right?

MR. HERNANDEZ: Yes, sir.

MR. GANDARA: And they're not even going to bring up the fact that you got arrested for possession of heroin, are they?

MR. HERNANDEZ: Excuse me?

MR. GANDARA: They're not even going to bring up the fact that you got arrested for possession of heroin, are they?

MR. HERNANDEZ: I don't understand your question.

MR. GANDARA: Are they going to file charges against you for possession of heroin? What—

MR. HERNANDEZ: No, they're not.

MR. GANDARA: happened to those charges? Where did they go?

MR. HERNANDEZ: I don't know what happened to them.

**377.** *Id.*, Rep. R., Vol. 32 of 37, at 148–55.

**378.** *Id.*, Rep. R. Vol. 32 of 37, at 155–56. State's Exhibit 17 is a written communication, dated June 2, 1999, on the letterhead of the El Paso County Criminal District Attorney, Jaime Esparza. *State v. Ortiz*, Trial Ct. No. 980D08993, Rep. R., Vol. 37 of 37, State's Ex. 17 (disclosure letter dated June 2, 1999). The correspondence is addressed to Jaime Gandara, Ortiz's defense counsel, and signed by Assistant El Paso County Criminal District Attorney Rick Locke. *Id.* The text of the letter reads:

Dear Mr. Gandara:

The Motion to Revoke in Cause No. 73464 regarding potential witness Hector Hernandez was dismissed and the defendant will be modified to straight probation "intensive" at the end of the trial of Ricardo Ortiz. The decision *NOT* to modify the probation until after the trial, was made by Judge Dinsmoor and is not a condition of testifying in any manner or not testifying at all.

There are no written or unwritten deals for the testimony of Hector Hernandez. However, it was guaranteed to Mr. Hernandez that he would not be arrested and jailed on the Capias in Cause No. 73464 so long as he was a potential witness against Ricardo Ortiz.

Mr. Hector Hernandez is currently being housed as an out-of-state witness during the pendency of this trial, after which he will be returned to his originating state where his probation will resume.

Sincerely,
/s/ Rick Locke
RICK LOCKE
Trial Chief
Assistant District Attorney

*Id.*

MR. GANDARA: You don't know? They just went away?

MR. HERNANDEZ: No, they did not go away.

MR. GANDARA: They were pending all the time that you were out, and they've been dropped so that you could come testify, haven't they?

MR. HERNANDEZ: No, that was not the case.

MR. GANDARA: Do you remember telling your lawyer Donna Snyder that—

MR. LOCKE: You know, that's hearsay. Let's bring her in.

THE COURT: Hold on. Mr. Locke.

MR. GANDARA: He's already admitted—

THE COURT: It's a prior inconsistent statement. Once he admits it, there's no need to bring in Ms. Snyder.

MR. GANDARA: You've already admitted to us that you've told her this?

MR. LOCKE: This has been asked and answered.

THE COURT: Sustained.

MR. LOCKE: This is a preface to another question.

MR. GANDARA: You told her you had a deal. You admitted to us that you told your lawyer you had a deal, right?

MR. HERNANDEZ: What I told her is that when I would come, that I would not get arrested. That's what I told her. And I wanted advice whether I should come or not because I was unsure about getting arrested.

MR. GANDARA: And you've also told us that you were instructed not to say that anybody was going to cut any deal with you or give you any consideration to come testify. You were given instructions to say that, right? Told her that. Do you remember telling your lawyer that?

MR. HERNANDEZ: I don't remember.

MR. GANDARA: All right. We'll hear it. We can hear it—

MR. LOCKE: You know, I'm going to object to sidebar and speaking—

THE COURT: Sustained.

MR. LOCKE: Thank you, Your Honor.

THE COURT: Sustained.

MR. GANDARA: So first you tell the jury about 40 minutes ago—

MR. LOCKE: I'm going to object. It's been asked and answered if he told them 40 minutes ago.

THE COURT: Well, let me hear the question.

MR. LOCKE: Thank you, Your Honor.

MR. GANDARA: That you don't have a deal. Then you tell the jury, you admit, yeah, I really did, and I lied about it. Okay? And then Mr. Locke talks to you and you say you don't have a deal, and then now you say you don't remember?

MR. LOCKE: This is a question, Your Honor? Is he making some kind of closing argument. I'm going to object that—

MR. GANDARA: So—

MR. LOCKE: it's multiple.

THE COURT: I'm going to sustain. I'm a little confused about that.

MR. GANDARA: So you don't know what the truth is, do you? You have no idea what the truth is, do you?

MR. HERNANDEZ: I know what the truth is.

MR. GANDARA: Pass the witness.[379]

379. *Id.*, Rep. R. Vol. 32 of 37, at 156–60.

As part of the defense case-in-chief, Gandara called attorney Donna Snyder ("Snyder") to testify about Hernandez's statements to her regarding the existence of a deal with the prosecutors in Ortiz's case. Snyder told the jury that Hernandez consulted with her via telephone about testifying as a witness against Ortiz:

MR. GANDARA: In his consultation with you, did he tell you that he had an agreement for favorable treatment from the prosecutors with regard to his criminal record if he testified?

MS. SNYDER: Yes, he did.

MR. GANDARA: He affirmed to you that he had a deal with them?

MS. SNYDER: He told me that he was going to have a clean record and have a chance at a new life with his little girl.

MR. GANDARA: Did he tell you anything about whether he should disclose that on testimony from the stand?

MS. SNYDER: He told me he was concerned because it was his understanding that if he was asked on the stand if he had an agreement he should say no, he didn't because it would look bad.

MR. GANDARA: Pass the witness.[380]

On cross-examination, Locke had Snyder read the disclosure letter aloud.[381] After Snyder read the final portion of the letter, which stated that it was Judge Dinsmoor's decision not to modify Hernandez's probation until after Ortiz's trial, the following exchange ensued:

MR. LOCKE: Do you know who Judge Dinsmoor is?

MS. SNYDER: I've heard of him, but I've never appeared before him.

MR. LOCKE: You practice criminal law here?

MS. SNYDER: I practice primarily civil law, sir.

MR. LOCKE: Well, when you—I know the defense attorney asked you, did you practice criminal law here?

MS. SNYDER: Yes.

MR. LOCKE: And you don't know who Judge Dinsmoor is?

MS. SNYDER: I've never appeared before Judge Dinsmoor.

MR. LOCKE: How about this Judge? Have you ever appeared before him in a criminal case?

MS. SNYDER: Yes, sir, I have.

MR. LOCKE: Do you know what probation is?

MS. SNYDER: Yes, sir, I do.

MR. LOCKE: Do you know what intensive probation is?

MS. SNYDER: I can't say that I do.

MR. LOCKE: But you practice criminal law here?

MS. SNYDER: I've been practicing criminal law for about a year in Texas.

MR. LOCKE: Okay. Is that a clean record?

MS. SNYDER: I would say it was not a clean record.

MR. LOCKE: Okay. If that has been disclosed to this defense attorney and is a public record, do you think that's a secret deal?

MS. SNYDER: Well, it certainly doesn't seem consistent with what my client told me.

MR. LOCKE: I have no further questions of this witness, Your Honor.

[Redirect examination]

---

380. *Id.*, Rep. R. Vol. 33 of 37, at 114.

381. *See supra* text accompanying note 378.

MR. GANDARA: So Hector Hernandez told you that his record would be clean. That's what he said? He'd have a chance to start a new life with his little girl with a clean record. So the bottom line is there's a difference between what Mr. Locke told me and what he told Hector Hernandez, right?

MS. SNYDER: That's my understanding.

MR. LOCKE: Excuse me?

THE COURT: Mr. Locke?

MR. LOCKE: Well—I have nothing further.

MR. GANDARA: No further questions.[382]

### B. The Hearing on Ortiz's Motion for New Trial

The trial court convened a hearing on September 3, 1999 to entertain argument on Ortiz's Motion for New Trial. Ortiz called attorney Snyder as his sole witness. Over a running hearsay objection lodged by the prosecution, Snyder testified that, over the ten days leading up to Ortiz's trial, she spoke three times on the telephone with someone representing himself as Hernandez.[383] Snyder conceded that she never met Hernandez in person, and relied on the assurances of her former client (Hernandez's mother) that the person with whom she was speaking was in fact Hector Hernandez.[384] On direct examination, Snyder described why Hernandez consulted her:

Ms. Snyder: He was scared because the prosecutors were trying to get him to come in to talk with them, and he had been on the lam for some time. And he was told that they wouldn't arrest him, because he was a witness for the State.

And he wanted to know if that was true, because he had real questions about the honesty of the prosecutors and whether or not he could trust them, in part because he was—it was—he told me that he was instructed that if he was on the stand, he shouldn't say that he had a deal, because it would look bad.

He was particularly concerned, because of the violation of probation and the underlying crime that had given rise to that probation. He said that the prosecutor had stated that he didn't—if you'll forgive me, Your Honor, the way it was said to me was, he didn't give a shit about that, what he wanted was this man dead.

Mr. Gandara: And so what was—what did he tell you was the nature of his agreement with the prosecution?

Ms. Snyder: That if he testified against Mr. Ortiz, he would be a free man and have an opportunity to make a new life with his family.[385]

The trial judge stated that he intended to deny the motion for new trial from the bench, because he concluded that Hernandez "testi[fied] at trial, subject to cross-examination, about this very same agreement, and the jury got to hear all about that. So, I mean, I don't know what else we can do. I mean, there is no evidence that there was an agreement other than a hearsay statement, basically."[386] The trial judge nonetheless indicated that he would hold the matter open to permit Ortiz to subpoena Judge Dinsmoor, to ask Judge Dinsmoor whether a deal existed between Hernandez and the State.[387]

---

382. *Id.*, Rep. R. Vol. 33 of 37, at 118–21.

383. *Id.*, Rep. R. Vol. 33 of 37, at 22.

384. *Id.*, Rep. R. Vol. 36 of 37, at 22–23.

385. *Id.* Rep. R. Vol. 36 of 37, at 20.

386. *Id.* Rep. R. Vol. 36 of 37, at 28.

387. *Id.* According to the State, Judge Dinsmoor had been the one who decided to delay any action on Hernandez's revocation until

THE COURT: If you feel like you want to reopen this hearing, please let me know. Otherwise, I'll go ahead and enter an order and get that proceeding. So if you want to bring some other witnesses and set this for another evidentiary hearing, I'm at your disposal as far as that's concerned. But let's do that pretty soon, like in the next week or two.

MR. GANDARA: Thank you[,]Your Honor.

THE COURT: Or if you have a reason for extending that time period, I mean, I'll do that. You just need to let me know what it is you need. Otherwise, from what I've heard so far, I'm going to deny your motion for new trial.[388]

When Ortiz did not avail himself of the trial judge's offer, the trial judge denied the Motion for New Trial.

### C. The Affidavit of Hector Hernandez, Submitted as Part of Ortiz's State Application for Habeas Corpus Relief

In support of his instant claim at the state level, Ortiz appended a notarized statement from Hernandez, dated July 23, 1998. In full, it reads:

I[,] Hector Hernandez, being of sound mind and body, wish to change a statement that I gave to Homicide Detectives 08/22/97 regarding the alleged murder of Gerardo Garcia. The detectives in said matter took what little information I had given to them and twisted it all up. They then coached me into changing my story so that it seemed as if Ricardo Ortiz had murdered Mr. Garcia thus allowing the Grand Jury to return a guilty verdict for Capitol [*sic*] Murder. To my knowledge this is what actually took place. On the evening of 08/17/97 at around 10:00 or 11:00 PM, in Tank 430 in the EL [*sic*] Paso County Jail, Gerardo Garcia approached me and others with an undetermined amount of Heroine in several balloons. Mr. Garcia gave Heroine to anyone who accepted including myself. That same night I injected myself with Heroine and by 11:00 PM I was alone in my cell drawing. The next morning Mr. Garcia was found on a cell floor in Tank 430 having overdosed on Heroine. /s/ Hector Hernandez. SUBSCRIBED AND SWORN BEFORE ME THIS 23 DAY OF JULY 1998 /s/ William [illegible] NOTARY PUBLIC

### D. The State Habeas Court's Factual Findings

The state habeas court entered the following factual findings regarding Ortiz's *Brady* claim. Hector Hernandez testified at trial and denied that he made a deal for his testimony with the State.[389] Hernandez stated that he reached an agreement with the State, in which the State promised that he would not be arrested on an outstanding warrant, so long as he was a potential witness against Ortiz.[390] Hernandez also stated that no one told him that he must testify in a particular way, or testify at all, in exchange for not being arrested on that warrant.[391] The State

---

after Ortiz's trial. *Id.; see also supra* text accompanying note 375.

**388.** *Id.,* Rep. R. Vol. 36 of 37, at 31–32.

**389.** *Ex parte Ortiz,* No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 17.

**390.** *Id.* at ¶ 18.

**391.** *Id.*

submitted a letter into evidence as State's Exhibit 17.[392] The letter was from lead prosecutor Rick Locke and addressed to Ortiz's trial counsel.[393] Therein, through Locke, the State explicitly denied that it had made any deals in exchange for Hernandez's testimony.[394] At a hearing on Ortiz's Motion for New Trial, the trial court afforded Ortiz an opportunity to present new evidence of the alleged secret deal between Hernandez and the prosecutors, but Ortiz did not do so.[395] Regarding Hernandez's affidavit, which Ortiz attached to his state writ application, the state habeas court found that the affidavit did not mention a deal between Hernandez and the State, either secret or disclosed.[396]

### E. The Brady Standard

The prosecution's suppression of evidence favorable to the accused denies him due process of law when the evidence is material either to guilt or innocence, or to punishment, regardless of whether the accused specifically requests the information and the prosecution's good or bad faith.[397] The three essential elements of a Brady prosecutorial misconduct claim are: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the exculpatory or impeaching evidence must be sufficiently material such that prejudice to the defense ensued from its suppression.[398]

> The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[399]

With these principles in mind, the Court considers whether, concerning Ground Four of his Petition, Ortiz has shown that the state courts reached a decision that contravened or unreasonably applied clear-

392. *Id.* at ¶ 19.

393. *Id.*

394. *Id.*

395. *Id.* at ¶ 20.

396. *Id.* at ¶ 21.

397. *See Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (setting forth the evolution of the *Brady* standard and the essential components of a *Brady* claim, explaining that not every violation of the prosecution's broad duty of disclosure necessarily establishes a due process violation); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that the prosecution must disclose impeaching evidence as well as exculpatory evidence); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that the prosecution's duty to disclose evidence favorable to the accused applies whether or not the accused requests the information); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that, regardless of the prosecution's good or bad faith, its suppression of evidence favorable to the accused upon the accused's request denies him due process, where the information is material to the issue of the accused's guilt or punishment).

398. *See Banks*, 540 U.S. at 690–691, 124 S.Ct. at 1272.

399. *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936; *see Kyles v. Whitley*, 514 U.S. 419, 433–44, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("The adjective ['reasonable probability'] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

ly established federal law, or that the state courts' decision on the merits resulted from an unreasonable determination of the facts in light of the evidence before them.

### F. Discussion

■ The Court has carefully examined the trial record, as well as the state courts' factual findings and legal conclusions made in the context of Ortiz's direct appeal and state writ application. After this review, the Court finds that Ortiz has not shown, as it is his burden to do, that the state courts unreasonably applied clearly established federal law. That is, Ortiz has not demonstrated that the state courts unreasonably applied the *Brady* standard to the facts of Ortiz's case or unreasonably determined what those facts were.[400]

On direct appeal, the Court of Criminal Appeals correctly identified and applied the *Brady* standard. It concluded, on one hand, that Ortiz had not satisfied the suppression prong of the *Brady* analysis because he had not established that an undisclosed arrangement existed between Hernandez and the prosecutors.[401] On the other hand, it reasoned, the question of whether or not Hernandez possessed a disclosed or undisclosed incentive to testify against Ortiz was an issue fully open for the jury's consideration.[402] Thus, the Court of Criminal Appeals found that Ortiz had not demonstrated prejudice under the *Brady* standard, even if he could show suppression of material impeachment evidence.[403] Nothing in Ortiz's pleadings or the record persuades the Court that the

Court of Criminal Appeals unreasonably applied the *Brady* standard to the facts then before it.

The state habeas court reached an identical conclusion regarding the suppression issue and therefore also concluded that Ortiz had failed to establish a due process violation under *Brady*.[404] Hernandez's alleged post-trial repudiation of his testimony regarding the events directly surrounding Garcia's death, it concluded, did not implicate Hernandez's trial testimony concerning the existence of a undisclosed arrangement between himself and the prosecution.[405] The Court finds that the record supports the state habeas court's reading of Hernandez's post-trial affidavit and its conclusions regarding the affidavit's negligible impact on Ortiz's *Brady* claim. Although the content of Hernandez's affidavit, if believed, implicates the veracity of his trial testimony regarding Ortiz's actions on the night Garcia died, the affidavit does not mention a deal with prosecutors in exchange for his testimony.

Regardless of how one chooses to characterize the arrangement between Hernandez and the prosecutors assigned to Ortiz's case, everyone in the courtroom, including the jury, was well aware of the arrangement by the time Hernandez finished testifying. Nothing containing any potential impeachment value was withheld from Ortiz's counsel. Under such circumstances, the state courts' resolution of Ortiz's *Brady* claim was neither contrary to, nor an unreasonable application of, clearly

---

400. *Wiggins*, 539 U.S. at 520, 123 S.Ct. 2527; *Woodford v. Visciotti*, 537 U.S. 19, 24–5, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); *Bell*, 535 U.S. at 694, 122 S.Ct. 1843; *Penry*, 532 U.S. at 792, 121 S.Ct. 1910; *Williams*, 529 U.S. at 407–8, 120 S.Ct. 1495.

401. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim.App.2002).

402. *Id.*

403. *Id.*

404. *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶¶ 17–20.

405. *Id.* at ¶ 21.

established federal law, as established by the Supreme Court of the United States, nor did the decision result from an unreasonable determination of the facts in light of the evidence before it.[406]

VIII. *GROUND FIVE: ORTIZ'S CONVICTION AND DEATH SENTENCE OFFEND THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION BECAUSE THE STATE CONVICTED ORTIZ OF CAPITAL MURDER UNDER A STATUTE WHICH WAS NOT ENACTED UNTIL AFTER GARCIA'S DEATH.*

A. *Background*

The State charged Ortiz with capital murder pursuant to Texas Penal Code §§ 19.03(a)(2)[407] and 36.06, the latter representing Texas' retaliation statute. When Garcia died, Section 36.06 provided, in pertinent part, that:

(a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of the service of another as a public servant, witness, prospective witness, informant, or a person who has reported or who the actor knows intends to report the occurrence of a crime; or

(2) to prevent or delay the service of another as a public servant, witness, prospective witness, informant, or a person who has reported or who the actor knows intends to report the occurrence of a crime.[408]

By Ortiz's trial, the Texas Legislature had amended the statute as follows:

(a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of *the service or status* of another as a:

(A) public servant, witness, prospective witness or informant; or

(B) person who has reported or who the actor knows intends to report the occurrence of a crime; or

B. to prevent or delay the service of another as a:

(A) public servant, witness, prospective witness, informant; or

(B) a person who has reported or who the actor knows intends to report the occurrence of a crime.[409]

On direct appeal, Ortiz claimed that the trial court charged the jury under the amended version of the retaliation statute and thereby violated the *Ex Post Facto* Clause of the United States Constitution.[410] The Court of Criminal Appeal rejected his argument on the merits, determining that Ortiz had not established an *ex post facto* violation.[411]

B. *The Parties' Arguments*

The Parties do not dispute that, at the close of evidence in the guilt-innocence phase, the trial judge incorrectly charged Ortiz under the new version of the retaliation statute. The Parties do, however, vigorously disagree regarding the consequences of that error.

---

406. *See supra* note 240.

407. *See supra* text accompanying note 1.

408. TEX. PENAL CODE ANN. § 36.06 (West 1995).

409. TEX. PENAL CODE ANN. § 36.06 (West 1997) (emphasis added).

410. *Ortiz v. State,* 93 S.W.3d 79, 90–91 (Tex. Crim.App.2002).

411. *Id.* at 91.

Ortiz argues that, by retroactively applying the amended version of the retaliation statute to him, the trial court violated the *Ex Post Facto* Clause of the United States Constitution.[412] In support of his claim, Ortiz asserts that the Legislature's insertion of the words "or status" into the revised statute added an alternative element to the offense.[413] Ortiz posits that it was therefore impossible for him to determine from the indictment whether the State intended to charge him with violating the older or amended version of the statute.[414] Ortiz further challenges the Court of Criminal Appeals's conclusion, based primarily on its reading of *Rogers v. Tennessee*, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), that the *Ex Post Facto* Clause places no restraints whatsoever on judicial action.[415]

Here, Ortiz says, *Rogers* does not control the adjudication of Ground Five, because the legal basis for his claim rests squarely in the *Ex Post Facto* Clause and not the Due Process Clause.[416] Ortiz as-

serts that the trial court did not choose to change the decisional law of Texas and then to apply that alteration retroactively to him—actions which, if taken, would implicate the due process issues confronted in *Rogers*.[417] Instead, Ortiz avers, the trial court:

deliberately instructed the jury that it might convict [him] of capital murder on the basis of a statute which could not, consistently with the United States Constitution, be applied to criminalize his conduct. The fact that the Texas Legislature evidently did not intend the statute to apply in his case is of no moment. All that matters is that the statute was applied retroactively, and that its retroactive application is forbidden by the *Ex Post Facto* Clause of Article I, Section 10, and not by the Due Process Clause of the Fourteenth Amendment, as interpreted by the Supreme Court in *Bouie* and *Rogers*. The constitutional infirmity is exactly the same whether the legis-

---

412. Pet'r's Br. 58.

413. *Id.* at 60.

414. *Id.*

415. Ortiz notes that the Court of Criminal Appeals cited two separate cases for the proposition that the *Ex Post Facto* Clause does not apply to the judiciary: (1) *Johnson v. United States*, 529 U.S. 694, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000), and (2) *Rogers. Id.* at 61–63. Although Ortiz contends that the Court of Criminal Appeals's reliance on *Johnson* was merely nominal, Ortiz nonetheless takes pains to distinguish *Johnson* from the case at bar. *Id.* Ortiz argues that Johnson is inapposite to his instant claim, because the *Johnson* Court did not construe the *Ex Post Facto* Clause. *Id.* at 61. Instead, Ortiz argues, the *Johnson* Court considered only whether, as a matter of statutory construction, the lower federal court had applied existing law correctly, and not whether the lower court had erroneously applied new law retroactively. *Id.* at 61–62.

*Rogers*, Ortiz asserts, also does not control the adjudication of his claim. *Id.* at 62. In that case, Ortiz insists, the Supreme Court merely retreated from dicta contained in *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), which suggested that the Due Process Clause incorporates the full panoply of retroactivity prohibitions set forth in the *Ex Post Facto* Clause and imposes them on the judiciary. *Id.* According to Ortiz, the *Rogers* Court clarified that the retroactivity prohibitions contained in the *Ex Post Facto* Clause are not co-extensive with those imposed under the Due Process Clause and merely discussed the circumstances in which a retroactive reinterpretation of a common law doctrine violates a criminal defendant's right to due process. *Id.*

416. Pet'r's Br. 62–63; *see also supra* text accompanying note 411.

417. Pet'r's Br. 62–63.

lature or the court commands it.[418]

Ortiz emphasizes that he is challenging the trial court's retroactive application of the amended retaliation statute, and not its retroactive reinterpretation of the statute made concomitant to its common law function.[419] Ortiz argues that "to hold that the *Ex Post Facto* Clause does not prohibit such applications unless the Legislature has expressly authorized them trivializes the constitutional prohibition and is openly contrary to, or an unreasonable application of, settled Supreme Court jurisprudence." [420]

Respondent contends Ortiz has demonstrated nothing more than that the Texas Legislature revised the retaliation statute between Garcia's death and Ortiz's trial, and that the trial court erroneously charged the jury under the new version of the statute.[421] Ortiz has not, according to Respondent, established an *ex post facto* violation.[422] To do so, Respondent argues, Ortiz must show that the amended statute criminalized previously innocent behavior.[423] Alternatively, Respondent avers, Ortiz must demonstrate that being

charged under the amended statute compromised Ortiz's due process interests by failing to give him fair notice that his conduct was considered criminal and punishable by law.[424] Respondent asserts that Ortiz has failed to carry his burden in either regard.[425]

### B. Legal Standard—Ex Post Facto Claims

The *Ex Post Facto* Clause of the United States Constitution prohibits "any State" from passing an "*ex post facto* law." [426] A law is prohibited under the *Ex Post Facto* Clause if it: (1) punishes a previously committed act as a crime, if the act was not considered criminal when it was committed; (2) increases the punishment for a crime, after the offense's commission; (3) deprives the defendant of a defense to the charge that was available when the act was committed, or (4) alters the rules of evidence so that the government can obtain a conviction with less or different testimony than was required when the offense was committed.[427]

---

418. *Id.*

419. *Id.* at 63.

420. *Id.*

421. Resp't's Br. 42.

422. *Id.*

423. *Id.* at 43–44.

424. *Id.* at 44. Respondent also defends the Court of Criminal Appeals's conclusion that being charged under the amended statute did not implicate due process interests. *Id.* Respondent notes that the Court of Criminal Appeals carefully considered the difference between the "status" and the "service" of a prospective witness. *Id.* at 43–44. It determined that, as used in the context of a prospective witness, there was little, if any, difference between the two terms because the word "prospective" in the retaliation statute denotes a future event. *Id.* Respondent con-

cedes that the trial court was mistaken in its jury instruction, but insists that Ortiz cannot show that his constitutional rights were violated. *Id.* at 44.

425. *Id.*

426. U.S. Const. art. I, § 10, cl. 1.

427. *Collins v. Youngblood*, 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *see Calder v. Bull*, 3 U.S.(3 Dall.) 386, 1 L.Ed. 648 (1798) (interpreting the *Ex Post Facto* Clause to prohibit four categories of legislative enactments: "1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law

In *Rogers,* the Supreme Court made clear that the *Ex Post Facto* Clause does not apply to the retroactive application of judicial decisions.[428] Rather, the restrictions that exist on the retroactive application of judicial decisions flow from due process concerns.[429] Although "the Due Process and *Ex Post Facto* Clauses safeguard common interests—in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of arbitrary and vindictive use of the laws," it would be "mistaken to suggest that these considerations compel extending the strictures of the *Ex Post Facto* Clause to the context of common law judging."[430]

> The *Ex Post Facto* Clause, by its own terms, does not apply to the courts. Extending the Clause to courts through the rubric of due process thus would circumvent the clear constitutional text. It also would evince too little regard for the important institutional and contextual differences between legislating, on

one hand, and common law decisionmaking, on the other."[431]

Accordingly, "the retroactive application of new interpretations of criminal statutes and judicial alterations of common law doctrines of criminal law only implicate due process limitations 'where the new interpretation or change is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'"[432]

## C. Discussion

The Court recognizes the distinction Ortiz makes between the trial court's retroactive application of the amended retaliation statute, as opposed to its retroactive reinterpretation of the statute made pursuant to its common law function. The Court additionally finds that the Court of Criminal Appeals did not necessarily perceive or address this distinction. However, the task of Court is not to analyze the method by which the Court of Criminal Appeals arrived at its ultimate legal conclusion regarding Ortiz's *Ex Post Facto* claim.[433] The Court's function under the

---

that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender.").

428. *Rogers,* 532 U.S. at 462, 121 S.Ct. 1693 (stating that "it has long been settled by the constitutional text and [the Supreme Court's] own decisions: that the *Ex Post Facto* Clause does not apply to judicial decisionmaking.").

429. *See id.* at 459, 121 S.Ct. 1693 (noting that restrictions on the retroactive application of judicial decisions stem from notions of due process rather than from the *ex post facto* jurisprudence); *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (holding that a court's retroactive application of a Supreme Court decision violated the defendants' due process rights, because the retrospective application punished conduct that had been considered innocent under prior law); *Bouie v. City of Columbia,* 378 U.S. 347, 353, 84 S.Ct. 1697, 12 L.Ed.2d

894 (1964) (holding that, although an unforeseeable judicial enlargement of a criminal statute, if it is applied retroactively, operates precisely like an *ex post facto* law, such retroactive application of judicial decisions is prohibited by the Due Process Clause); *Janecka v. Cockrell,* 301 F.3d 316, 322–23 n. 9 (5th Cir.2002) (citing *Rogers* for the proposition that the limitations placed on legislative power under the *Ex Post Facto* Clause are not identical to the restrictions placed on judicial power, which stem from due process concerns).

430. *Rogers,* 532 U.S. at 460, 121 S.Ct. 1693.

431. *Id.*

432. *Janecka,* 301 F.3d at 324 n. 11 (quoting *Rogers,* 532 U.S. at 462, 121 S.Ct. 1693).

433. *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (en banc).

AEDPA is merely to determine whether the Court of Criminal Appeals' resolution of Ortiz's claim was unreasonable, given clearly established federal law.[434] In keeping with its role under the AEDPA, the Court has examined the retaliation statute in question against the four distinct factors that can establish a violation of the *Ex Post Facto* Clause. After such review, it finds that the Court of Criminal Appeals, in rejecting Ortiz's claim, did not reach a decision that contravened or unreasonably applied clearly established federal law.

Although Ortiz may have had a valid basis for lodging a trial objection, due to the defect in the jury charge, here, under clearly established federal law, that deficiency did not translate into an *Ex Post Facto* Clause violation. It is similarly clear that applying the revised version of § 36.06 to Ortiz did not violate his rights under the *Ex Post Facto* Clause. The amended version of the retaliation statute did not criminalize previously innocent conduct, because murdering Garcia in retaliation for his perceived or expected co-operation with authorities would have been an offense under either version of the statute.[435] The revised retaliation statute did not, after Garcia's murder, increase the punishment that Ortiz would face for his offense, because murder in retaliation was a capital crime under both the previous and amended versions of the statute.[436] The intervening change in the law also did

not deprive Ortiz of a defense that would have been available to him on the date of Garcia's murder or diminish the State's burden of proof.[437] In light of the above, the Court of Criminal Appeals did not render a decision in a manner that entitles Ortiz to relief under the AEDPA.

## IX. GROUND SIX: IN VIOLATION OF RING AND APPRENDI, ORTIZ WAS DENIED A JURY FINDING BEYOND A REASONABLE DOUBT THAT THERE WERE NO MITIGATING CIRCUMSTANCES SUFFICIENT TO WARRANT THE IMPOSITION OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE.

### A. The Parties' Arguments

Ortiz directs the Court to the fact that criminal defendants found guilty of capital murder cannot be sentenced to death under Texas law, unless the jury finds beyond a reasonable doubt that the defendant is likely to pose a continuing threat to society.[438] If the jury returns such a finding, then it must additionally consider whether any sufficient mitigating circumstance or circumstances exist to warrant the imposition of a life sentence rather than the death penalty.[439] If the jury answers the second "special question" in the affirmative, then the trial court is obliged to impose a life sentence.[440] If the jury answers the question in the negative, how-

---

434. *Pondexter,* 346 F.3d at 148; *Neal,* 286 F.3d at 246.

435. *Compare* TEX. PENAL CODE ANN § 36.06(a)(1) (West 1995) (stating that it is an offense to harm or threaten to harm another by an unlawful act in retaliation for the individual's service as a witness or prospective witness) *with* TEX PENAL CODE ANN § 36.06(a)(1)(A) (West 1997) (stating that it is an offense to harm or threaten to harm another by an unlawful act in retaliation for the individual's service or status as a witness or prospective witness).

436. *See supra* text accompanying note 1.

437. *See* TEX. CODE CRIM. PROC. ANN. art. 38.03 (Vernon 1998) (setting forth the presumption of innocence and reasonable-doubt standard of proof in criminal cases).

438. Pet'r's Br. 64.

439. *Id.* at 64–65.

440. *Id.* at 64.

ever, the trial court must sentence the defendant to death.[441]

Ortiz challenges the constitutionality of Texas's capital sentencing procedure based on the fact that the relevant statute does not assign a standard of proof to the lack of mitigation special question: "What is not given by the statute is the standard of proof, or level of confidence, applicable before the jury is authorized to answer the mitigation issue negatively." [442] Ortiz asserts that this omission violates the holdings of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[443] The state habeas court concluded that Ortiz was not entitled to relief regarding his argument, noting that the Court of Criminals Appeals had repeatedly rejected such claims.[444]

Respondent counters that Ortiz's entire *Ring–Apprendi* argument rests on the fallacious premise that the *absence* of mitigating circumstances constitutes an aggravating circumstance which increases the maximum penalty for capital murder.[445] Respondent notes that the prescribed statutory maximum penalty for capital murder in Texas is death.[446] Each element of the offense, as well as the aggravating sentencing factor represented by the first special question, it avers, must be, and in

Ortiz's case, were, proved to a jury beyond a reasonable doubt.[447] Therefore, Respondent argues, Ortiz's death sentence was not obtained in a manner that denied him fair notice or through judicial fact-finding that resulted in an enhanced sentence.[448] Respondent also contends that the absence of sufficient mitigating circumstances is not an element of capital murder and is furthermore not an aggravating fact that increases the penalty for capital murder.[449] Instead, Respondent asserts, the presence of sufficient mitigating circumstances is plainly a mitigating fact, which allows a defendant to escape the maximum penalty for capital murder.[450] Respondent contends that Ortiz's *Ring–Apprendi* argument is accordingly inapposite.[451] Lastly, Respondent avers that expanding *Ring* and *Apprendi* to encompass mitigating factors would violate the nonretroactivity rule set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).[452]

### B. Discussion

■ The Court first notes that Ortiz presented no evidence whatsoever at the punishment phase of his trial. Despite the fact that Ortiz did not actually provide any allegedly mitigating evidence for the jury to evaluate, Ortiz petitions the Court to review the constitutionality of Texas's capi-

441. Tex. Code Crim. Proc. Ann. art. § 37.071(g) (Vernon 1998).

442. Pet'r's Br. 66.

443. *Id.* at 66–67.

444. *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 144. In support of its legal conclusion, the state habeas court cited to the following Texas cases: *Ladd v. State*, 3 S.W.3d 547, 573–74 (Tex.Crim.App.1999); *Williams v. State*, 937 S.W.2d 479, 491 (Tex.Crim.App. 1996); and *Lawton v. State*, 913 S.W.2d 542, 557–58 (Tex.Crim.App.1995).

445. Resp't's Answer 45.

446. *Id.*

447. *Id.*

448. *Id.*

449. *Id.* at 47.

450. *Id.* at 45.

451. *Id.*

452. *Id.* at 52 n. 22.

tal sentencing scheme, in particular, the fact that Texas assigns no burden of proof to the jury's mitigation consideration. Ortiz is thus asking the Court to render an advisory opinion.[453] However, the Court may only adjudicate actual cases or controversies.[454] On this ground alone, the Court therefore would conclude that Ortiz is not entitled to relief.

Furthermore, even if Ortiz had offered allegedly mitigating evidence for the jury to consider, the Court would still find that Ortiz has failed to show that he is entitled to relief under the AEDPA. The *Apprendi* Court held that, "other than the fact of a prior conviction, any fact·that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[455] In *Ring*, the Supreme Court relied on *Apprendi* to overturn the portion of Arizona's capital sentencing procedure which assigned trial judges, rather than juries, the responsibility for determining the presence or absence of aggravating factors required for the imposition of the death penalty.[456] It is clear that Texas' death penalty scheme does not violate the holding of *Apprendi* or *Ring*. In Texas, the jury determines a defendant's eligibility for the death penalty, using a reasonable doubt standard.[457] There is consequently none of the judicial fact-finding or use of a lesser burden of proof that the Supreme Court found constitutionally impermissible in *Apprendi* and *Ring*. Moreover, Ortiz has not directed the Court to any Supreme Court case expressly requiring a state to prove the absence of mitigating circumstances beyond a reasonable doubt, nor is the court aware of any such precedent. Thus, even if it were inclined to do so, the Court cannot extend the holdings of *Apprendi* and *Ring* to the arena of mitigating evidence without creating a new rule of constitutional law, in violation of the principles expressed in

**453.** In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the petitioner successfully argued that his Eighth and Fourteenth Amendment rights were violated because, under the Texas capital sentencing scheme as it then existed, the statutory special questions did not allow the jury to give full effect to the allegedly mitigating evidence the petitioner presented to it at the punishment phase, regarding his mental retardation and the significant physical and emotional abuse he suffered during childhood. *Id.* at 318, 109 S.Ct. 2934. The Fifth Circuit Court of Appeals has repeatedly held that a *Penry* claim may be based only on evidence actually introduced or offered at trial. *West v. Johnson*, 92 F.3d 1385 (5th Cir.1996); *Briddle v. Scott*, 63 F.3d 364, 377 (5th Cir.1995); *Anderson v. Collins*, 18 F.3d 1208, 1214–15 (5th Cir. 1994); *Allridge v. Scott*, 41 F.3d 213, 223 (5th Cir.1994); *Callins v. Collins*, 998 F.2d 269, 275 (5th Cir.1993). Although the arguments are not identical, as with a *Penry* claim, Ortiz here seeks to challenge the way in which Texas's mitigation special question operates. It is but a logical extension of Fifth Circuit precedent to determine that Ortiz is not entitled to an adjudication on the merits of his instant claim, when he failed to provide the jury with any allegedly mitigating evidence to consider.

**454.** *See* U.S. Const. art. III., § 2 (stating that "the judicial Power shall extend to all Cases ... and ... to controversies."); *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (explaining that the exercise of judicial power under Article III depends upon the existence of a case or controversy and that federal courts have no power to render advisory opinions or to decide questions that cannot affect the rights of the litigants before them); *Doe v. Veneman*, 380 F.3d 807, 814 (5th Cir.2004) (noting that, without an actual case or controversy, a federal court has no jurisdiction).

**455.** *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

**456.** *Ring*, 536 U.S. at 588–89, 122 S.Ct. 2428.

**457.** Tex. Code Crim Proc. Ann. art 38.03.

*Teague v. Lane.*[458] Under such circumstances, the state habeas court's adjudication of Ortiz's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as established by the Supreme Court of the United States, nor did the decision result from an unreasonable determination of the facts in light of the evidence before it.[459]

## X. GROUND SEVEN: ORTIZ'S DEATH SENTENCE OFFENDS THE EIGHTH AMENDMENT BECAUSE TEXAS' CAPITAL SENTENCING SCHEME PRECLUDED THE JURY FROM CONSIDERING EVIDENCE OF HIS CHARACTER IN MITIGATION OF PUNISHMENT.

### A. The Parties' Arguments

Ortiz argues that, under the Supreme Court's holdings in *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), to withstand constitutional scrutiny, a state's capital sentencing scheme must authorize the jury to consider any character evidence proffered by a capital defendant in mitigation of his punishment.[460] Ortiz asserts that Texas's capital sentencing scheme is constitutionally defective because it does not permit jurors to consider the defendant's character as a mitigating factor, except to the extent that it bears on the issue of his moral culpability for his conduct.[461] Where, as here, Ortiz argues, his defense team's strategy was to con-

vince the jury that their client should be spared, not because he was individually less culpable for his crime, but because society should bear part of the responsibility for molding his criminal character, the jury was unable to consider such evidence as mitigating.[462]

Respondent answers that, pursuant to article 37.071 § f(4) of the Texas Code of Criminal Procedure, the trial court instructed the jury that "you shall consider 'mitigating evidence' to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness." [463] Although Ortiz insists that this definition of mitigating evidence unconstitutionally limited the relevance of Ortiz's character and background and made the jury unable to consider Gandara's closing argument—that Ortiz deserved to escape the death penalty because he was the product of "an irresponsible prison system"—Respondent argues that Ortiz's position is incorrect and precluded by Fifth Circuit precedent.[464] Respondent asserts that Texas's capital sentencing procedure properly places the mitigating value of constitutionally relevant evidence within "the effective reach" of the jury, which is all that is constitutionally required.[465] Further, Respondent argues, in *Beazley v. Johnson,* 242 F.3d 248 (5th Cir.2001), the Fifth Circuit Court of Appeals expressly rejected the proposition that Texas's definition of mitigating evidence unconstitutionally limits the evidence that the jury can consider under the

---

458. *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (setting forth the circumstances in which the Supreme Court creates a new rule of constitutional law and when that rule should be applied retroactively).

459. *See supra* note 240.

460. Pet'r's Br. 69.

461. *Id.*

462. *Id.*

463. Resp't's Answer 55.

464. *Id.*

465. *Id.* at 55–56.

mitigation special issue.[466] In that opinion, Respondent avers, the Court of Appeals explained that "virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability apart from its relevance to the particular concerns embodied in the Texas special issues." [467]

### B. The State Habeas Court's Adjudication of the Merits

The state habeas court determined that Ortiz was not entitled to relief on his claim that Texas's sentencing scheme does not permit the jury to adequately consider mitigating evidence.[468] It observed that the Court of Criminal Appeals had rejected an identical argument in *Richardson v. State*, 879 S.W.2d 874, 883–84 (Tex.Crim. App.1993).[469]

### C. Discussion

 As the Court noted regarding Ortiz's previous claim, Ortiz presented no evidence in mitigation of punishment at the penalty phase of his trial. This fact is significant because, although Ortiz does not label it as such, his present argument is clearly an outgrowth of a *Penry* claim.[470] A *Penry* claim may be based only on evi-

dence actually introduced or offered at trial.[471] Here, Ortiz failed to present any evidence whatsoever at the punishment phase of his trial. He also failed to identify any other potentially mitigating evidence in the record that he claims his jury was unable to adequately consider under Texas's capital sentencing scheme. Given these circumstances, the state courts' rejection of Ortiz's claim on the merits was did not contravene or unreasonably apply clearly established federal law, as established by the Supreme Court of the United States.[472] Similarly, the state courts' decision did not result from an unreasonable determination of the facts in light of the evidence before it.[473] Further, for the reasons set forth at length by Respondent, including its assertion that the Fifth Circuit's holding in *Beazley* precludes relief, it is clear that Ortiz had not carried his burden under the AEDPA.

## XI. CERTIFICATE OF APPEALABILITY

To appeal the denial of a habeas corpus petition filed under 28 U.S.C. § 2254, the petitioner must obtain a Certificate of Appealability.[474] Appellate review of a habeas petition is moreover limited to the issues on which a CoA is granted.[475] In

---

**466.** *Id.* at 56.

**467.** Resp't's Answer 56 (emphasis in original) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.2001)).

**468.** *Ex parte Ortiz*, No. 54,488–01 (Tex.Crim. App.2003), Tr. Ct.'s Find. of Fact & Concl. of Law, ¶ 144.

**469.** *Id.* at ¶ 145.

**470.** *See supra* text accompanying note 448.

**471.** *West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996); *Briddle v. Scott*, 63 F.3d 364, 377 (5th Cir.1995); *Allridge v. Scott*, 41 F.3d 213, 223 (5th Cir.1994); *Anderson v. Collins*, 18 F.3d 1208, 1214–15 (5th Cir.1994); *Callins v. Collins*, 998 F.2d 269, 275 (5th Cir.1993).

**472.** *See supra* note 240.

**473.** *Id.*

**474.** 28 U.S.C.A. § 2253(c)(2); *Miller–El v. Cockrell*, 537 U.S. 322, 335–36, 123 S.Ct. 1029, 154 L.Ed.2d 931.

**475.** *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n. 10 (5th Cir.2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the scope of appellate review from the denial of habeas petition is limited to issue on which the CoA granted).

other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to solely those issues on which CoA is granted.[476]

■ A CoA to appeal the denial of a habeas corpus petition shall be granted only upon "a substantial showing of the denial of a constitutional right." [477] The showing necessary to obtain a CoA on a particular claim depends upon the manner in which the District Court has disposed of a claim. If the Court rejects a prisoner's constitutional claim on the merits, he must then demonstrate that reasonable jurists could find the Court's assessment of the constitutional claim to be debatable or wrong.[478] If the petitioner wishes to challenge the Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, he must satisfy two requirements.[479] First, the petitioner must demonstrate that jurists of reason would debate whether the petition states a valid constitutional claim.[480] Second, the petitioner must show that jurists of reason would debate whether the Court was correct in its procedural ruling.[481] This Court is authorized to address the propriety of granting a CoA *sua sponte.*[482]

In considering whether an unsuccessful federal habeas corpus petitioner is entitled to a CoA, the Court must adhere to the AEDPA's highly deferential standard of review. Thus, the issue before the Court when determining whether the petitioner is entitled to a CoA is not whether reasonable jurists could disagree with the Court's resolution of the merits of petitioner's claims for relief.[483] Rather, the question is whether reasonable jurists could disagree with the Court's determination that the state courts acted reasonably when they denied the petitioner's claims on the merits.[484] In a death penalty case, the Court should resolve any doubt as to whether a CoA should issue in favor of the petitioner.[485]

Viewed in proper context, the Court finds that, with the exception of Ortiz's *ex post facto* claim (*i.e.,* Ground Five), which the Court finds is worthy of further encouragement, there is no basis for disagreement among jurists of reason regarding the Court's disposition of Ortiz's claims. As detailed in Part II.C and D, *supra,* of this Opinion, the greater part of Ground One is clearly precluded from a federal merits review on independent and adequate state law grounds, and Ortiz presents no persuasive argument to overcome the procedural bar to federal review. Further, for the reasons discussed in Part IV, *supra,* of this Opinion, the Court finds there can be no disagreement among reasonable jurists that, concerning the portion of Ground One that is properly before the Court, Ortiz has clearly failed to establish

**476.** 28 U.S.C.A. § 2253(c)(3); *Crutcher,* 301 F.3d at 658 n. 10; *Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997); *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997).

**477.** 28 U.S.C.A. § 2253(c)(2); *Miller–El,* 537 U.S. at 327, 123 S.Ct. 1029.

**478.** *Miller–El,* 537 U.S. at 338, 123 S.Ct. 1029.

**479.** *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

**480.** *Id.*

**481.** *Id.*

**482.** *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

**483.** *Id.*

**484.** *Id.*

**485.** *Medellin v. Dretke,* 371 F.3d 270, 275 (5th Cir.2004) (*per curiam* ).

a claim under *Witt,* the applicable federal standard for the selection and exclusion of jurors in capital cases.

The Court has independently reviewed Ortiz's two ineffective assistance claims (Grounds Two and Three) and concluded that neither of the alleged grounds of error satisfy either prong of the applicable *Strickland* test. On one hand, there can be no doubt that the state habeas court applied the correct federal constitutional standard (*i.e., Strickland* ) in rejecting Ortiz's ineffective assistance claims. There can similarly be no doubt that, in so doing, the state habeas court applied the *Strickland* test in an objectively reasonable manner.

As to Ground Four, Ortiz's attempt to establish a *Brady* claim is utterly unpersuasive. For the reasons discussed at length in Part VII, *supra,* of this Opinion, Ortiz has completely failed to satisfy any of the necessary elements of a *Brady* claim.. Thus, in determining that Ortiz's *Brady* claim was without merit, the state courts did not decide the issue in a manner that entitles Ortiz to relief under the AEDPA or to a CoA from this Court.

Regarding Grounds Six and Seven of Ortiz's Petition, in which Ortiz attacks the constitutionality of Texas's mitigation special question, the Court concludes that there can be no disagreement among jurists of reason that Ortiz failed to show that the state courts, in rejecting these claims, reached a decision contrary to clearly established federal law, unreasonably applied firmly established law, or based its decision on an unreasonable determination of the facts in light of the evidence presented to it.

Under such circumstances, the Court concludes that Ortiz is not entitled to a CoA with regard to any of his claims for relief raised herein, with the exception of Ground Five.

## XII. CONCLUSION & ORDER

For the reasons set forth above, the Court accordingly enters the following orders:

1. All relief requested in Petitioner Ricardo Ortiz's Petition for federal habeas corpus relief, filed February 9, 2004 is **DENIED.**

2. Petitioner Ricardo Ortiz is **GRANTED** a Certificate of Appealability with respect to Ground Five of his Petition. A Certificate of Appealability is **DENIED** as to Ortiz's remaining claims.

3. All other pending motions in this case, if any, are **DISMISSED AS MOOT.**

**SO ORDERED.**

### FINAL JUDGMENT

On this day, the Court entered an Order dismissing Petitioner Ricardo Ortiz's "Petition for Writ of Habeas Corpus (28 U.S.C. § 2254)," filed through counsel on February 9, 2004. The Court additionally granted Ortiz a Certificate of Appealability regarding Ground Five of his Petition, but declined to certify his remaining issues for appeal. The Court now enters its Final Judgment pursuant to Federal Rule of Civil Procedure 58.

**IT IS HEREBY ORDERED** that Petitioner Ricardo Ortiz's "Petition for Writ of Habeas Corpus (28 U.S.C. § 2254)" is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Petitioner Ricardo Ortiz is **GRANTED** a Certificate of Appealability regarding Ground Five of his Petition, but the Court declines to certify his remaining issues for appeal.

**IT IS LASTLY ORDERED** that all other pending motions in this cause, if any, are **DENIED AS MOOT.**

**SO ORDERED.**